Bruce v. Roney et al.

JOEL BRUCE, Plaintiff in Error, v. ROBERT RONEY et al., Defendants in Error.

ERROR TO SCOTT.

A resulting trust does not spring from an agreement between the parties, but from the fact that the money of one person has been invested in land, the conveyance of which is made in the name of another. The trust is raised in favor of the party whose money has been used, with or without his knowledge, in the purchase.

A writ of assistance should be granted, not by the clerk, but by the circuit court, on hearing of the facts.

RONEY filed a bill in chancery, in Scott Circuit Court, against Joel Bruce, Michael Brown, and William C. Stryker.

The bill states, that in the year 1850, Roney went to California, to be gone two or three years; that he left, at his home, in Scott county, Illinois, with his mother, certain horses, hogs, cattle and farming utensils, of about the value of $400; that it was understood, when he left, that his mother was about to marry said Bruce; that Roney made an arrangement with Bruce to buy for him certain land, described in the bill, in Scott county.

Bruce wrote to Roney, after he got to California, that he had bought the land for $450, and had paid on the land $100, which Roney had sent to his mother, and requested Roney to send him more money to pay on the land, and Roney sent $100 more, to be paid on the land. That Bruce appropriated to his own use the personal property which Roney had left behind, and which should have been applied on the land. That Bruce also owes him for work done for him, for twelve months, at $16 per month.

Bruce took the deed for the land in his own name, and has received the rents and profits since the purchase. Bruce has withheld the deed from record, and the exact time of purchase is not known. The land was purchased of Michael Brown. That Bruce holds the land in trust for Roney. Claims that he has paid Bruce in money, property and work, $597, or that the land cost $450. That Bruce has given a mortgage on the land to Wm. C. Stryker, for $300, not recorded. Bill makes Bruce, Brown and Stryker parties; waives Bruce's answer being under oath; prays that an account be stated of money advanced, proceeds of personal property, rents and profits, etc. Prays for decree that Bruce convey the land to Roney, and a decree for the balance due Roney; that if any incumbrances exist, Roney, be allowed to assume them, and have a decree against Bruce for the amount. Alleges that he has paid $450, but if not, offers to pay amount due. Prays for general relief.

At October term, 1854, Bruce answers that Roney did go to California, but denies that he left property in his mother's charge. Denies that he owned any property as alleged; that one Williams fitted him out for California, and Bruce advanced him $25. Bruce married Roney's mother after he went to California, and received, on his marriage to her, personal property, worth about $100; that she had three children that Bruce took home with him and supported. Denies that Roney ever made any arrangement with him to buy the land. That he bought the land for himself, and has paid for it himself, and denies that Roney has any claim to it. That he has offered Roney an interest in the land, if he would help to pay for it. That he has never done so, but is indebted to Bruce. That Roney did send his mother $100, before her marriage, $95 of which came into Bruce's possession after his marriage with Roney's mother.

That Bruce, in 1852, received from Roney, from California, $100, which he has accounted for and paid back. That he bought the land, and paid $500 for it. Has improved said land; improvements worth about $408.

Denies the account as stated in the bill, being due Roney, and insists that Roney is indebted to him $424.

Replication filed to this answer. Stryker answers that he has a mortgage on the land, to receive $300 on a note, dated 28th January, 1854, payable 1st January, 1855, with ten per cent. interest. That he took the mortgage without notice of Roney's claim.

The special master in chancery of Scott county reports, that on behalf of Roney, James W. Riggs testified that he knows the handwriting of Joel Bruce, and that the letters attached to the report are in Bruce's handwriting. Was at Bruce's office when he bought land of Michael Brown; same described in bill. The price was $400 or $500. Though present when deed made, witness heard nothing said about Bruce buying the land for any one but himself; $100 paid down; don't know whose money it was. Roney was then in California. Bruce has made improvements on land.

J. Z. Zimmerman testifies for Roney, that some months before, he offered to purchase a part of the land from Bruce. Bruce said he would not sell, because he designed part of it for Roney, if he would help to pay for it. This was since Roney came from California. Describes improvements.

David Stewart. Bruce told witness that Roney had written to him to buy the land for him. Don't know that he ever told me he had bought it for Roney. B. said that Roney had sent him $100 to pay on land, at least so understood him. On cross-examination, said, can't say whether before or after

Bruce purchased land that I heard him say what have stated. Think it was before his wife died. Bruce did not say whether Roney had sent the money to him, or to his (Roney's) mother. Roney worked some on the place. There were some hogs on the place, when he went to California, that were said to be Roney's.

Joel W. Cobb testified that he went to buy a piece of the land from Bruce. Bruce told me that he had bought the land for Robert Roney, and would not sell any of it until he came from California, and if Roney wanted to sell it he might do so.

Colt spoken of was left at his mother's, when Robert Roney went to California. Afterward saw it in Bruce's possession, after he had married Roney's mother. Roney's mother sold a house and lot in Glasgow, and got, in payment, a horse, that she swapped for mare that foaled this colt.

John Ray testified. Roney had a number of hogs, say ten or fifteen, when he went to California. Saw a part of them, afterward, in Bruce's possession.

Jesse McMahan testified. Bruce sold a black horse, which belonged to Robert Roney, for $100.

Bruce told me that he had paid, on that land, $200 of Roney's money; that it would be better for Roney to have the money invested in land. Bruce sold 18 or 20 hogs, worth $30 or $40, which belonged to Roney.

Know of Roney's working for Bruce since his return; most of twelve months. Good hands getting from $16 to $20 per month.

Only knows of ownership of horse because he got the mare from me that foaled it. He traded me a horse for it. I only knew of the ownership of the hogs because Roney and his mother told me they were his. The hogs were raised on the widow's place. All I know about selling the hogs is what Sutton told me. Can't say how often I have seen Roney working on the place. Saw him frequently eating at Bruce's.

Bruce told me that $100, that he paid on the land, was sent to Roney's mother before he married her. Didn't understand who the other $100 was sent to.

Bruce sold the hogs after he married Roney's mother.

George Henly testified. Know of Bruce's selling twenty hogs to Sutton, after his marriage with Roney's mother. Hogs belonged to Roney. Roney worked some at Bruce's. Is half brother of witness.

Lorenzo Cobb testified that he had seen Roney work on this land. Don't know who he was working for. Bruce was his stepfather. He made that his home. He done the cooking the most of the time when I was there.

Bruce offered following evidence: Robert Roney made

his time at Bruce's until January, a year ago, after he came from California. He stayed with Bruce, and worked sometimes; not as a hired hand. Did not more than earn his board. I live about one hundred yards from Bruce's. While he made his home at Bruce's he worked on buggies and wagons; for himself part of the time. There were enough hogs at the widow's, when Bruce married her, to make their meat.

When Roney went to California, there was a black colt on the place, worth $20. After he left, Bruce took care of the colt, and fed it and broke it, until it was three or four years old, when he sold it.

William Mace testified that he saw $100 in Roney's mother's possession, some months before she married Bruce, which came from her son, in California. She said her son directed her to pay his small debts out of it, and keep the balance for herself. This was before she married Bruce. Roney, after he came home, made Bruce's his home. Did not work much more than enough to pay his board. Roney's mother, after he went to California, offered to sell me the colt for $10. Bruce advised her not to sell it. The colt was afterward with Bruce's stock.

Roney's mother had possession of the colt, and of the mare, until the colt went into Bruce's possession. The mare died.

Grandison Chapman testified that he worked at clearing upon the disputed land, since Roney returned from California. I told Roney, that if he had an interest in the land, that it was as much his interest as Bruce's to have the land cleared, and he ought to *see me paid.* Roney said, " *damn the land, I have nothing to do with it.*" This was after he had left boarding at Bruce's. When I was at Bruce's didn't see him do much work except cooking.

Joshua Hanks testified that Roney made his home at Bruce's after he returned from California. Never worked regularly at anything. Sometimes he cooked; sometimes worked at gunsmithing; sometimes at buggy making. He was quite a genius.

Pleasant M. Pheers testified. Bruce paid me a bill, for Roney, of $9.10. Was for iron to go on a buggy.

Joseph Somers. Bruce paid me $31.90, for Roney. Roney got the goods, and Bruce, by agreement of parties, paid for them. Summers testifies that Bruce paid him $3.05, for Roney.

Leighton testifies to receipt from Andrews to Roney; is in Andrews' handwriting.

Condit swears that Bruce paid him $4, for hats got by Roney. The evidence of A. H. Heaton.

George L. Brown proves the payment for goods, bought by Roney, and paid for by Bruce.

Joseph Heller testifies that Roney got a gun, when he went to California, for $15. Bruce went his security, and paid for

it. I asked security because R. was going to California, and I knew of no property he was leaving behind. If he had property I suppose I would have known it.

Hirtland testifies to the payment, by Bruce, for articles got by Roney, and, at his request, charged to Bruce. Amount about $23.

Jacob Noel, $3.07, for lumber got by Roney; ordered by him to charge to Bruce. B. paid for it.

Wm. C. Gwin. Roney got two buggy dashes; cost $6. Ordered them charged to Bruce. Another one stands on the books, charged to Bruce and Roney.

Burrows testifies that these dashes were put on to buggies by Roney, and appropriated by him. Roney told him he intended to have the south half of the Bruce farm, and was going to get out timbers to put a house on it. I told Roney that he ought to have a settlement with Bruce. Roney said that he intended to have a settlement; that Bruce had said he would let him have the south half of the place. Said, afterward, he was going to have a settlement with Bruce; that he did not know what he was going to do.

Complainant then called, as witnesses:

James S. Smith testifies about buying some smith's tools of Bruce, for $42.50.

Barnum Cobb testifies about Roney ironing a wagon for Bruce, worth $20 or $25. Roney was with Bruce for about one and a half years; wages worth about $15.

Samuel Peck testifies that Bruce told him he sold the black colt for $100, but thought he ought to have something for keeping it.

McEvers testifies that Bruce told him that Roney was at his house a year and nine months.

J. Z. Zimmerman testifies to price of keeping horses and colts.

Frederick Loher testifies that Roney told him he was going to have half the land; if Bruce would give him his choice, he would take the south half. That Bruce would make him a deed to it. Roney said that Bruce said, sometimes, that he would give him a deed, and then, again, he said he would not.

Houghton testifies that Roney told him he was going to build a house on south part of land, and have the land divided.

Joshua Hanks testifies. Improvements on land worth $427.

James Clanton testifies said improvements are worth $427.

Moses Sutton testifies that he bought some hogs of Bruce, but gave the note in name of Mrs. Henly, Roney's mother. I gave $20 for them.

James Steele testifies that Roney told him he was willing, and wanted a deed for half the land; that if Bruce would

make him a deed for half of it, he would assist him to pay the debts against it.

R. Andrews testifies that Roney bought iron, and a hat, amounting to $40.10, on an order from Bruce. When it fell due Roney begged me not to sue it, as he would have to pay the costs, and talked of borrowing the money to pay it. Bruce has since paid it.

This was all the evidence.

Master states an account between Bruce and Roney, which see, and strikes a balance thus :

Due Roney, Bruce keeping the land.... .......................$215.44

If Roney gets the land there would be due Bruce, for improvement... 427.00
Deduct for sales of timber, rents, etc., allowing for services......... 187.00

$240.00
Deduct balance in favor of Roney, as above..................... 215.44

$24.56

Leaving this sum, $24.56, due Bruce from Roney, *besides* purchase money, if Roney keeps the land.

Roney excepts to master's report.

Cause submitted and final decree for complainant, Roney, for the lands in controversy, ordering Bruce to make a deed, etc.

Bruce brings this cause here by writ of error, and assigns for error the rendition of said decree.

W. A. & J. GRIMSHAW, for Plaintiff in Error.

N. M. KNAPP and D. A. SMITH, for Defendants in Error.

CATON, J. This is a bill filed to enforce the execution of a resulting trust, although, from the nature of the transactions between the parties, an account between them has become necessarily involved. The position assumed by the counsel for the plaintiff in error, is at once recognized as the law. A resulting trust does not arise from or depend upon any agreement between the parties. Its very name implies that it is independent of any contract, and is raised by the law itself upon a particular state of facts. It results from the fact that one man's money has been invested in land, and the conveyance taken in the name of another. It is immaterial whether the purchase was made and the money paid by the trustee, or the *cestui que trust*. This may be done by either, without the knowledge of the other. No matter how or by whom done, if the fact exists, if it was done at all, by mere operation of law, a trust is raised in favor of the party whose money was

used to purchase the land, either to the whole or his equivalent portion of the land.

The great question in this case, then, is one of fact. Did Bruce purchase and pay for this land with the money of Roney? No verbal agreement, which Bruce had made, to purchase the land for Roney, can entitle him to the relief sought, nor can any subsequent promise or agreement that he would convey the land to him. While, however, such agreements cannot, of themselves, afford ground for relief, they may properly be considered, as tending or helping to prove the main fact, namely, whose money was invested in the land. In a large majority of the cases of resulting trust which have fallen under my observation, agreements of some sort have been proved, and they frequently, in connection with other facts and circumstances, enable the mind readily to determine whose money paid for the premises. In this case it is pretty satisfactorily shown, that Bruce agreed, before Roney went to California, to purchase this land, or a part of it, for him, if he would remit funds for that purpose. This is clearly manifest, not only from the repeated declarations of Bruce, but also from his written correspondence with Roney, while in California. But the expressions used in these declarations and letters leave it exceedingly doubtful, whether Bruce was to, or did buy the land on the joint account of Roney and himself, or on the account of Roney alone; while the declarations and conduct of Roney, after his return, leave the decided impression that he was to have but half the land. Such is the conviction left upon our minds, after all the evidence furnished in the master's report is considered. Considering the case as one of resulting trust, as before shown, this evidence of an agreement, or the intention of the parties, cannot of itself be allowed to fix and control the rights of the parties, but it may serve a material purpose in aiding us to arrive at a correct conclusion upon the main fact, as to whose money paid for the land. It is very clearly established that the price paid for the land was four hundred and fifty dollars. And it is equally clear, from Bruce's acknowledgments, both parol and written, that two hundred dollars of this purchase money was sent from California, by Roney, and belonged to him, at the time it was paid for the land; and we think it equally clear that the whole four hundred and fifty dollars did not belong to him, but that Bruce paid for it, in part, out of his own money. It is true, that he had other money, belonging to Roney, in his hands, besides that sent from California; but how much he had, at any given time, is uncertain; and it is still more uncertain how much of that he actually paid upon the land. Assuming that Bruce, at the time he made the purchase, actually intended

to purchase one half for himself, and the other half for Roney, and we feel warranted in the conclusion that he paid the other twenty-five dollars of Roney's half of the purchase money out of the other moneys, in his hands, belonging to Roney. This, we think, is consonant with the whole evidence in the case, when taken together and fairly considered, and accordingly so find.

We arrive at the same final result, if we consider this as a case of agency, as was insisted by the counsel for the defendant in error; if we are correct in our previous conclusion, that the original intention was to make a purchase for the joint benefit of Roney and Bruce.

The decree of the circuit court requires Bruce to convey the whole of the land to Roney. In this we think the court erred, and that he is entitled to but one half of the land.

We can find no fault with the master's report, in the account stated by him; or in the value of the improvements made by Bruce, as stated in the report; nor with the basis of security expressed in the decree, on the one hand to secure to Bruce the value of his improvements, and, on the other, to secure Roney against the incumbrance which Bruce has placed upon the land. The same principles should be observed in the decree to be rendered in the circuit court, when the suit is remanded, conformable, however, to the rights of the parties as herein established.

An objection is taken to that portion of the decree which authorizes the clerk of the circuit court to issue a writ of assistance, on the application of the complainant, without any further order of the court. This objection, we think, is well taken. Should a writ of assistance become necessary to put the complainant in possession of the interest in the land to which he is entitled, he should be required to present the facts, requiring the assistance, to the circuit court; so that the court itself may judge of the propriety of awarding the writ.

The decree of the circuit court must be reversed, and the suit remanded, with directions to that court to enter a decree conformable to the rights of the parties as herein established.

*Decree reversed.*