RAYMOND GILLETTE *et al.* Appellees, *vs.* ARTHUR W. PLIMPTON *et al.* Appellants.

*Opinion filed December 21, 1911—Rehearing denied Feb. 8, 1912.*

1. REAL PROPERTY—*evidence must be convincing to establish an adverse equitable title.* In order to establish an adverse equitable title the evidence of such title must be clear and unequivocal and lead to but one conclusion.

2. SAME—*when legal titles will not be disturbed after lapse of time.* Legal titles will not be disturbed after a long lapse of time where the parties, with full knowledge of the facts, make no effort to have their rights declared; and this is especially true where the delay has been so great that the death of witnesses and loss of evidence render it practically impossible to make a defense.

3. DESCENT—*when provisions of section 11 of Statute of Descent do not apply.* Gifts to legatees or devisees who die before the death of the testator are not saved to the issue of the deceased legatee or devisee by the provisions of section 11 of the Statute of Descent unless such legatees or devisees are children or grandchildren of the testator.

4. PARTNERSHIP—*what is not sufficient to show a partnership.* The fact that two men who had formerly been business partners and were then living in the same house signed a memorandum saying, "We share our wealth, joy and burdens together. This means Jennie, too," (referring to a sister of one of the men, who resided with them,) is not sufficient to show a partnership between the men in the purchase of a tract of land, there being no other facts proven upon the question except that the men had owned another tract of land jointly and had sold the same, receiving a part of the purchase money three years and the balance more than one year before the other tract was bought.

5. WILLS—*party cannot take under will and in opposition to it.* Where a will bequeaths a legacy to one person and devises the homestead to another, the legatee cannot take the legacy under the will and at the same time recover the homestead, in a partition proceeding, in opposition to the will.

APPEAL from the Circuit Court of Grundy county; the Hon. SAMUEL C. STOUGH, Judge, presiding.

CHARLES C. SACHSE, O'DONNELL, DONOVAN & BRAY, JAMES S. DODGE, JR., and HARRY E. CARTHEW, (J. L. O'DONNELL, of counsel,) for appellants.

W. E. VINER, and J. W. RAUSCH, for appellees.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

On February 22, 1907, a bill was filed in this case in the circuit court of Grundy county by Raymond Gillette, a minor, by his next friend, and Jennie Gillette, heirs-at-law of George Gillette, deceased, against Hiram Plimpton and his conservator, J. C. Carr, and others, alleging that said George Gillette was the equitable owner of an undivided half of a section of land in Iroquois county and half a block in the city of Morris, in Grundy county, and the complainants prayed for partition and an accounting of rents and profits. Jennie Gillette died intestate on March 23, 1907, and Flora M. Gillette was appointed administratrix of her estate. Hiram Plimpton died testate on August 30, 1907, and J. C. Carr was his executor. A supplemental bill was filed alleging said facts and praying for the same relief against the devisees of Hiram Plimpton. By a subsequent amendment the complainants charged that said executor had collected money due Hiram Plimpton and George Gillette on a mortgage, and praying for an account of one-half to the administratrix of George Gillette. The answers denied any right or title in George Gillette and set up the Statute of Limitations and *laches.* The chancellor heard the evidence and granted the relief prayed for.

The claim of an equitable title to one-half of the real estate was based on an alleged partnership between Hiram

Plimpton and George Gillette, and the evidence to sustain the claim consisted of the testimony of witnesses concerning events and conversations running back to the year 1850. It seems essential to a satisfactory decision that the evidence should be stated, but, naturally enough, it is practically impossible to make any connected statement of facts proved, or their chronological order, because of the dim and uncertain recollection of witnesses, failing memories, and the fact that the witnesses sometimes varied as much as ten years concerning the dates of events they testified to. The facts, as nearly as they can be stated, are as follows:

About 1850 George Gillette and Jennie Gillette, his sister, and Hiram Plimpton and his wife, Eliza, who was a sister of George and Jennie Gillette, had come to Morris. Hiram Plimpton and George Gillette, as partners, kept a hotel from 1850 to 1854 or 1855, and ran an omnibus in connection with the hotel. When this business was closed they established a harness shop and were partners in that, but Plimpton left the shop at some time not fixed by the evidence. On July 4, 1856, a deed was made to Plimpton of a part of block 21 and a house was built on the premises soon afterward, which was occupied by all the parties as a home as long as they lived. Eliza Plimpton died on July 13, 1859, and after that the family consisted of the three remaining members. In 1860 a deed was made to correct some mistake in the deed of 1856. About 1869 Plimpton and T. T. Davis went into the pump business and sold pumps and eave-troughs around the country for a number of years, and about 1869 the harness business was closed up. Plimpton remained in the pump, lightning rod and eave-trough business with Davis for a term of years, and during part of that time he was also in business with one Jordan in buying and shipping poultry and eggs, and also bought furs, but the fur business seems to have been on his own account. The poultry, eggs and fur business continued until about 1878. Plimpton was also in the

grocery business with S. T. Hall for five or six years after he left the harness shop. There was also testimony that Plimpton was in the grocery business with a man named Eaton, but the time or period was not fixed. After Gillette left the harness shop he worked at different things, and there was testimony that he took care of the team used in the pump business, but it is certain that during the pump and grocery period he worked for Halburt at $40 a month for five years from February, 1872, in a clothing store, and gave his whole time to that business. At other times, and probably after he worked in the clothing store, he worked in a jewelry store and a cigar store. In 1867 or 1868 Plimpton owned a tract of land in Grundy county of eighty-two and one-half acres which he attended to personally, and he bought, sold and owned a great many other pieces of property in and about Morris. He and George Gillette were the owners of a half section of land in Grundy county, which they sold on March 3, 1869. Part of the purchase price was paid then and the remainder was all paid more than a year before November 3, 1873. On the latter date Plimpton loaned $6000 to William Peacock, secured by a mortgage on the section of land in Iroquois county. There is no evidence from what source the money came nor any evidence what became of the proceeds of the Grundy county land. The mortgage was made to Plimpton, and he afterward bought two junior mortgages on different parts of the section and caused sales to be made under powers in those mortgages. He bought the section at the sales and received deeds. Plimpton managed that property, rented it, visited it frequently, treated it in every respect as his own and always paid the taxes on it. The tenant who occupied it from the time it was bought up to the hearing did not know Gillette or suspect that he had or claimed any interest in the land. On May 27, 1893, Plimpton and Gillette jointly loaned to Ragan $3000 secured by mortgage, and the notes were payable to Hiram

Plimpton and George Gillette. These are the notes col-
lected by the executor of Plimpton. George Gillette died,
as before stated, on November 21, 1894, and no adminis-
trator of his estate was appointed until twelve years after-
ward, in 1906, when Flora M. Gillette took out letters of
administration. In 1900 Plimpton executed a will when
Jennie Gillette was present, disposing of all the real estate
and his other property, giving to her the net income of
the entire estate, including the use of the homestead in
Morris during her natural life, and devising the real estate
to relatives. She objected strenuously at the time to hav-
ing any of the property go to the Plimptons and insisted
that he should give her the homestead, but he refused to
do so. It does not appear that she made any claim that
George Gillette had any title or that she had as his heir,
but she did object to having any property go to Plimpton's
relatives. The taxes on the homestead were sometimes paid
in the name of Plimpton and sometimes in the name of
Plimpton & Gillette. On October 13, 1906, Carr was ap-
pointed conservator of Plimpton. There was no evidence
tending to prove the existence of any partnership after
Plimpton left the harness shop, except the recollection of
witnesses as to statements by him that he and Gillette were
interested in all their business, or remarks of that char-
acter. Witnesses testified that Plimpton said Gillette had
money in the Iroquois county land, and that he also said
that Jennie put money in it too, which would have as much
tendency to prove that Jennie Gillette was an equitable
owner as that George Gillette was. There was a memo-
randum in a diary under date of January 1, 1871, signed
by Gillette and Plimpton, saying: "We share our wealth,
joy and burdens together. This means Jennie, too," under
which were the figures "3-4-83." But clearly that was
insufficient to show a partnership between Plimpton and
George Gillette. The money from the sale of the half sec-
tion of land in Grundy county belonged to Plimpton and

Gillette jointly, but there is nothing from which an inference can be raised as to what became of it more than three years after part of it was paid and more than a year after the final payment.

There was no controversy concerning the existence of the partnership in the hotel business and the harness shop at the time the homestead was bought. The parties had no means when they engaged in the hotel business nor any known source of income except from their partnership undertakings. It is, perhaps, a fair inference from the evidence that the property in Morris was purchased and the house built with partnership money. The taxes were sometimes paid in the name of one and sometimes in the name of both, and the homestead was occupied by both with apparently equal rights. George Gillette remained there until he died and Jennie Gillette afterward, and so long as their right was not disputed there was no reason to make any claim to a conveyance of the legal title, at least until the will was made. We are not prepared to say that the chancellor erred in the decree respecting that property.

The notes collected by Carr, as executor, were payable to Hiram Plimpton and George Gillette, and that was not a matter which it was necessary to submit to the county court. The share of George Gillette was not collected as assets of the estate of Plimpton but was money belonging to the administratrix of Gillette. Carr, when he collected it, was bound to account to the administratrix for one-half, which she would have been entitled to recover from him personally, in an action at law. But as the court had equitable jurisdiction on other grounds it was not improper to settle the whole matter in the same suit.

In order to establish an adverse equitable title it is essential that the evidence of such title should be clear and unequivocal and lead to but one conclusion. It is also a settled rule with courts of equity that legal titles will not be disturbed after a long lapse of time, where parties, with

full knowledge of the facts, make no effort to have their rights declared. There is added force to the rule where the delay has been so long that the death of witnesses and loss of evidence render it practically impossible to make a defense. (*Wilcoxon* v. *Wilcoxon*, 230 Ill. 93; *Hamilton* v. *Hamilton*, 231 id. 128; *Weber* v. *Chicago and Western Indiana Railroad Co.* 246 id. 464.) In this case the complainants delayed until everyone who could have testified to the actual relations of the parties and the controlling facts was dead. When the original bill was filed Plimpton had lost his mind and had a conservator, and Gillette had long been dead. Plimpton had carried on business in poultry and eggs with Jordan, and Jordan was dead. He was in business with Eaton and Hall and Davis, and they were all dead. The necessity of the rule administered by courts of equity is made manifest by the facts of this case. The evidence was of such uncertain nature and based upon such doubtful and uncertain recollection of witnesses, and consisted to such an extent of nothing but alleged remarks of Plimpton, (which is a most uncertain sort of evidence,) that the rule requiring the evidence to be clear and unequivocal was not satisfied. Flora M. Gillette, who had become the wife of one Reichert, gave much testimony of the same general nature as that of the other witnesses, but she was a party to the suit and not competent to testify against the devisees of Plimpton. We cannot agree with the chancellor as to that part of the decree relating to the Iroquois land.

Deborah Wheelock and Mary Cottrel, devisees under the will of Hiram Plimpton, were alleged in the supplemental bill to have died before his death and their unknown heirs were made defendants. The decree established title in said heirs to the shares which the devisees would have taken if living. Their devises were not saved to their issue, if they left any, by section 11 of the Statute of Descent, as they were not children or grandchildren of the

testator, and the decree was wrong in that respect. The will gave the complainant Raymond Gillette $1000 and devised the homestead to another. He cannot take the bequest under the will and take the homestead in opposition to it.

The decree is affirmed so far as it establishes an equitable title in the homestead property in Morris and requires the executor to account for one-half of the money collected by J. C. Carr on the Ragan mortgage and is reversed in all other respects. The cause is remanded to the circuit court for further proceedings in accordance with the views expressed in this opinion. The costs of the appeal will be divided equally between the appellants and appellees.

*Decree affirmed in part.*