(No. 11828.—Decree affirmed.)

PEARL E. BAUGHMAN, Appellee, vs. RHODA ANN BAUGH-
MAN et al. Appellants.

*Opinion filed February 20, 1918—Rehearing denied April 4, 1918.*

1. TRUSTS—*when resulting trust arises—parol evidence.* Where the purchase money for land, or a definite part of it, is paid by one person and the title is conveyed to another person the law construes such facts as constituting a resulting trust, and such trust arises not from the contract or agreement of the parties but from their acts and may be established by parol evidence.

2. SAME—*there is no presumption of advancement where wife pays for land conveyed to husband.* Where a man pays for land and causes it to be conveyed to his wife or child the presumption is that it was intended as a gift or advancement, but the reasons for such presumption do not apply where the wife pays for the land and causes it to be conveyed to her husband.

3. SAME—*evidence of resulting trust must be clear but may be circumstantial.* Parol evidence to establish a resulting trust must be clear, strong and unequivocal and must establish the payment of the purchase money by the alleged beneficiary beyond doubt; but such evidence may be circumstantial as well as direct.

4. SAME—*declarations to establish a resulting trust must be direct.* While the statements of a deceased person as to who owned the land may be of such a nature as to base thereon a finding that a resulting trust arose, yet these declarations must be direct and certain, and, to be controlling, should be corroborated by other facts and circumstances.

5. SAME—*evidence of resulting trust is not sufficient if it can be explained upon any other theory.* Evidence which is doubtful or is capable of reasonable explanation upon any theory other than that of the existence of an implied or resulting trust will not be sufficient to entitle the beneficiary to a decree declaring and enforcing the alleged trust.

6. HUSBAND AND WIFE—*when husband's ante-nuptial agreement does not affect rights of his heir.* A husband's ante-nuptial agreement, which is executory and is not enforced in his lifetime, does not affect the rights of his daughter as his heir-at-law, where the husband and father dies intestate while the daughter is a minor.

7. SAME—*ante-nuptial agreement will not affect marital rights unless intention to do so is apparent.* The marital rights of a husband or wife will not be taken away by an ante-nuptial agreement unless the intention to do so is clearly apparent.

APPEAL from the Circuit Court of Christian county; the Hon. T. M. JETT, Judge, presiding.

L. J. TAYLOR, and W. B. McBRIDE, for appellants.

J. E. HOGAN, and GEORGE T. WALLACE, for appellee.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

This was a bill brought by Pearl Baughman, a minor, for partition (and to assign dower) of certain lands formerly owned by Sherman E. Baughman, deceased. Pearl Baughman was the only daughter by a second marriage of Sherman E. Baughman, appellants being his children by his first marriage. Appellants not only answered the original bill but filed a cross-bill. The case was heard on an amended original bill, cross-bill and answers, and a decree was entered finding the rights of the parties in accordance with the amended bill and dismissing the cross-bill for want of equity. This appeal followed.

The evidence shows that Sherman E. Baughman and his first wife, whose maiden name was Eliza Ann Seiberling, were married in Ohio in 1862. Their parents were neighboring farmers in Ohio. After they were married they farmed land belonging to Baughman's father for about three years, when Baughman came to Christian county, Illinois, and was soon joined by his wife. In March, 1865, he purchased 120 acres of land in Christian county for $3300, assuming two mortgages thereon amounting to $640. On April 1, 1868, he sold this 120 acres for $4200. In April, 1871, he bought 80 acres of land for $800. In May, 1874, he purchased 295 acres in the south half of a certain section 7, adjoining said 80 acres, in Christian county for $5313, mortgaging it for $2356. In June, 1879, he bought the northwest fractional quarter of section 7 for $3600, giving a mortgage thereon for $2000. In February, 1895,

he purchased the northeast quarter of section 7 for $12,000 and mortgaged it for $8000. About the time he purchased said 295 acres, the south half of section 7, he moved thereon and began to improve it with buildings and in other ways, and made that his residence until he left the farm and moved to Taylorville, in said county, about 1884, but he continued to conduct the farm, either through the work of himself and his family or by renting it to tenants. His first wife died in 1885, while they were living in Taylorville. He had born to him by his first marriage four daughters and three sons, Rhoda, Hattie, Katie, Carrie, Sam, Anson and Warren. Anson died intestate and unmarried after his mother's death, leaving his father and his brothers and sisters as his only heirs-at-law. When Baughman moved to Taylorville he went into the implement business and also began to manufacture wagons. His sons helped him in his business in Taylorville, and his first wife, until her death, assisted not only in the work in Taylorville but also in conducting the farm. He was married the second time in 1899 to Miranda E. Tarrant. She had been employed by him for some time as housekeeper on the farm, where she had taken care of the house and a number of farm helpers, she living there with two daughters by a former marriage. Before they were married, in September, 1898, Baughman drew an ante-nuptial agreement, a copy of which was found among his papers in his safe after his death, in 1916, this copy not being signed by him but by his second wife as Miranda Ellen Tarrant. After his second marriage he still continued to reside at his home with some of his children in Taylorville, some of his daughters being the housekeepers, while his second wife continued to live at the farm home and to keep house for the men who did the work on the farm. His daughter Pearl, the appellee herein, was the only child born to him by this second marriage. Three of his daughters by his first marriage, Hattie, Katie and Carrie, were married at the time of these proceedings, and his two liv-

ing sons, Sam and Warren, were also married. The two sons remained with him in the implement business until his death, apparently being partners in the last years of his life in that business and also in the milling business which he had established. The evidence tends to show that he was in debt about $19,000 when he moved from the farm to Taylorville, but the evidence does not disclose whether this indebtedness was for unpaid balances on farm land or for other obligations, although the evidence does tend to show that a large part of this indebtedness was not at that time secured by mortgage or trust deed on any of his farm land. The evidence shows that at the time of his death he was worth, including the fair value of the farm lands standing in his name and the real estate in Taylorville, in the neighborhood of $200,000 and was practically out of debt.

It is contended by appellants, as alleged in their answer and cross-bill, that all the land in section 7 was purchased by their father with money furnished by their mother, Eliza Ann Seiberling, and that because of that fact a resulting trust arose in her favor, and that therefore this land belongs to appellants by inheritance from their mother. The trial court did not sustain their contention in this regard. There can be no question that his first wife, Eliza Ann Seiberling, received considerable sums of money at various times from the time of her marriage to Baughman until her death, from her father, and that this money was used by the husband in purchasing land or in and about his business. The only serious question that can be argued with reference to this money is whether the evidence shows clearly and satisfactorily that it was used as a part of the purchase money for any or all of the land here in question. We find no positive evidence in the record that Baughman received any assistance from his parents, although there is evidence which tends to show that he borrowed money from his father at the time he came to Illinois and that this money was charged against him at the time his father's estate was

settled, but this settlement seems to have been made later than the purchase of any of the land here in question.

Sherman E. Baughman kept a much more accurate account of his business transactions than the ordinary farmer or business man, in which he attempted to put down all the items of receipts and disbursements in connection with his business or farm affairs and many of his reasons for his various family transactions. .These personal books of account were found among his effects after his death and were introduced in evidence. In one of them is a lead pencil memorandum made by Baughman in his own handwriting, reading: "Feb. 18, 1878, with this $1000 rec'd [or $1600, the figures and word after them being too indistinct to determine just what was intended,] makes $5081 dolars Eliza has in the farm." The original account book has been certified to this court and is before us for our consideration. While the lead pencil memorandum is not entirely clear, it can easily be read as to the date and as to the total amount of $5081 that his wife had in the farm. No attempt was made on the hearing and trial below, or here, to show that the memorandum was not in Baughman's own account book as made by himself. There were also introduced in evidence certain items from a memorandum account book purporting to be kept by Nathan Seiberling, the father of Eliza, the first wife, in which he made entries in his own handwriting showing gifts or bequests to his daughter Eliza as follows: February 15, 1865, $2000; November 1, 1869, $481; November 1, 1873, $1000; December 20, 1879, $500; and one on January 1, 1886, in which he gave or bequeathed to his son-in-law, Sherman E. Baughman, husband of Eliza, $1000. It is conceded by counsel for appellants that this last $1000 should not be considered as a part of the purchase money on the land in question. Testimony was also offered of statements made by Baughman, or in his presence and apparently with his approval, that his wife's money had been used to purchase

the farm. George Adams, who worked for Baughman from 1880 to 1885 and who carried on the farm apparently for Baughman for some little time after the removal to Taylorville, testified that he had a talk with Mr. and Mrs. Baughman and told them that one Hurlburt wanted to buy the farm, and that Mrs. Baughman spoke up and said, "No, George, we don't want to sell this farm; my money paid for this farm and we are going to keep it for the children," and that Baughman then said, "No, mother is right; we don't want to sell it." This witness also testified to another talk with Mr. and Mrs. Baughman in which they told him they did not want him to leave the farm; that he ought to marry and they would let him keep the farm as long as he wanted it; that he told them he didn't think anybody would marry him, and that Mrs. Baughman said, "Well, you can get married any time, if you will; you could marry Hat," (one of Mr. and Mrs. Baughman's daughters;) that Adams said in reply, "I never spoke to the girl in my life about anything like that; I don't believe she would have me;" that Mrs. Baughman then said: "We will deed Hattie that 80 acres of land the very next day after she marries if you will marry and take possession of this place; * * * there is an 80 acres apiece for all the children; * * * I paid for this land out of the money I got back east, even improved it; I helped haul lumber from Springfield, drove one of the teams, and Mr. Baughman and I hauled the lumber to build the house from Springfield." Another witness, W. S. Sharp, testified to a conversation in which Baughman told him the first place he got came through his wife's people and that he got further help from her people to improve a larger farm they bought, and that the farm belonged to his wife and came through her people. Jacob Yockey and Lee Schrantz, who lived near neighbors to the Baughmans for years, testified substantially to the same effect; that they heard Baughman say his wife's money went into the farm and that the land belonged to her.

There is also testimony tending to show that Nathan Seiberling, Mrs. Baughman's father, visited the Baughmans in Illinois in 1878 or 1879 and advised Baughman that he ought to buy the northwest quarter of section 7 in order to control the drainage of his land, (the south half of that section,) and that he (Seiberling) would furnish his daughter the money for the purpose of such purchase. Milton and Gustavus Seiberling, brothers of the first wife, both testified that they had visited the Baughmans in Illinois and that Baughman had visited them back at the old home, both before and after the death of his first wife, and that Baughman had said to them more than once that his first wife's money had helped purchase the land. Gustavus testified also that Baughman had told him that Nathan Seiberling had advised him to buy the northwest quarter of section 7 and told him he would furnish the money to pay for it, and that he knew that his father had sent some money out to Eliza; that Baughman, on his visit back to the old home in Ohio, was talking with him about the wisdom of the Seiberlings keeping the old homestead and advised him to keep it, and then talked about his farm in Illinois and said: "I could have gotten a large price for my farm but I couldn't think of selling it; I consider it my duty to hold it for the children; it belongs to them, as the purchasing of that farm came through their mother." Milton Seiberling testified somewhat to the same effect. He testified that once after the second marriage of Baughman he visited him in Illinois and went out to the farm here in question and the second Mrs. Baughman and some of the children were in the party; that he and Baughman walked out onto the farm, and that Baughman said to him in substance: "Milt, do you remember those checks we used to get, years ago? they came in just when we needed them; I suppose you got them the same as I did; that money that we received there all went into this farm here, to pay for the farm, and it has got to remain here for Eliza's children; I never expect to

sell it." On cross-examination he testified that he may have stated to the lawyer that the money went to pay off the debt on the farm, but that what he recollected Baughman to say was that it went "to pay for the farm."

In behalf of the appellee, Lorne Bulpitt, who was her brother-in-law and guardian, testified, over objection, that he had heard Sherman E. Baughman say many times in the presence of his wife and children that he had paid them all the Seiberling money that was coming to them, but that on one occasion Baughman said he had paid them within $2000 of all he owed of the Seiberling money; that in a discussion as to the division of the money or property between Baughman and his children he heard Baughman say that he wanted Pearl to share as much as the rest of the children; that on one occasion Rhoda Baughman said something about the Seiberling money, and Baughman replied: "Your Seiberling money? You haven't any; I have paid you back every dollar of the Seiberling money that is coming to you." Mrs. Clella Bulpitt, a half-sister of Pearl Baughman and the wife of the previous witness, testified she heard Baughman state, in substance, what her husband testified to. Louis Burkhart, a lessee of Baughman, testified for appellee that Baughman told him on one occasion that he was out of debt and that he had paid some of his wife's children's interest out in the farm; that he had just about paid them out. Several of the children of Baughman by his first marriage testified in contradiction to the testimony of the Bulpitts as to their discussions with their father about the division of the land. They stated that such discussions took place and that the Bulpitts were present; that the father was trying to get them to agree that the property should be divided equally among the children; that Pearl Baughman, the daughter by the second marriage, was to share equally with the children by the first marriage; that they all told him they didn't think that was fair; that they thought their mother's money went into the purchase

of the farm and should first be paid back to them; that their father never said he had paid them all the Seiberling money that had gone into the farm; that he did say in some of these conversations that he had paid them their share that was coming from the Seiberling estate.

It appears from the testimony in the record,—and this fact was also shown in an account book kept by Sherman E. Baughman,—that after the Seiberling estate back in Ohio was closed up the children by the first marriage each received $757.11 from their grandfather Seiberling's estate; that these shares were all paid to him (except Hattie's, which was paid direct to her,) and by him paid over to the children. The Baughman children by the first marriage, in testifying to their father's conversations, insisted that when he was talking about having paid them their full share of the Seiberling money he meant this legacy that came from the grandfather's estate and had no reference to the money given by their grandfather to their mother and which they claim was used as a part of the purchase money for the land here in dispute. They also testified that in some of these discussions the father proposed how he was going to divide the farm, giving certain portions to some of the children and the Taylorville property to others, with the understanding that if the Taylorville property was not worth as much as the other shares the children who received the farm were to make good the difference, and that Pearl was to have a part of the land given to her. They testified also that this suggested division by the father was satisfactory to them, as it would give them a larger share than would go to Pearl, which they thought would be fair.

Counsel for the appellee insist that as Lorne Bulpitt resigned, before the close of the hearing in the trial court, as guardian of Pearl Baughman his testimony should then be considered properly admissible under the Evidence act. Conceding for the purposes of this case that this evidence

was properly admissible then his wife's evidence was also properly admissible. But this evidence was flatly contradicted on material points by at least four of the children of the first wife. Therefore we think that the weight of the evidence as to the conversations had with these children and their father is to the effect that he considered that the children of his first wife had some claim on the land that he owned at the time of his second marriage, and that he was trying to get them to adjust this claim so as to allow his daughter Pearl to share equally with them without having a legal contest over the matter. So far as the evidence as to these family conversations between Baughman and his children in the presence of the Bulpitts is concerned, we think its weight favors the contention of counsel for appellants rather than that of counsel for appellee, and that these conversations clearly showed that Baughman claimed that at the time of the conversations he owned all of this land in his own name, to do with as he chose.

This court has frequently stated that where the purchase money for land is paid by one person and the title thereby purchased is conveyed to another person the law construes such facts as constituting a resulting trust. This trust arises not from the contract or agreement of the parties but from their acts. Such trust may be established by parol evidence. (*Brennaman* v. *Schell,* 212 Ill. 356.) "A resulting trust arises, if at all, the instant the deed is taken and the legal title vests. No payment made will create a resulting trust, unless, at the moment the title passes, the trust results from the transaction itself." (*Strong* v. *Messinger,* 148 Ill. 431; *Lord* v. *Reed,* 254 id. 350.) No oral agreement or payments before or after the transaction will create such a trust. The trust results from the action itself at the moment the title passes. (*Stephens* v. *St. Louis Union Trust Co.* 260 Ill. 364, and cases cited.) "Since a resulting trust cannot rest on an express agreement, no

parol agreement between the parties, made before or after the conveyance of property, can give rise to a resulting trust therein." (39 Cyc. 106.) It is true that where a man pays for land and causes it to be conveyed to his wife or child the presumption is that it was intended as a gift or advancement. (*Reed* v. *Reed,* 135 Ill. 482.) The reasons for so holding do not apply, however, where the wife pays for the land and causes it to be conveyed to her husband. (*Wright* v. *Wright,* 242 Ill. 71; *Ross* v. *Hendrix,* 110 N. C. 403.) "The intention of the parties to create a resulting trust is not necessary to its existence. A constructive trust often arises where the beneficiary not only does not intend to create the relation but has no knowledge of its existence at the time." (*Wright* v. *Wright, supra,* p. 78.) "A resulting trust does not arise from or depend upon any agreement between the parties. Its very name implies that it is independent of any contract and is raised by the law itself upon a particular state of facts. It results from the fact that one man's money has been invested in land and the conveyance taken in the name of another. It is immaterial whether the purchase was made and the money paid by the trustee or the *cestui que trust.* This may be done by either without the knowledge of the other. No matter how or by whom done, if the fact exists,—if it was done at all,—by mere operation of law a trust is raised in favor of the party whose money was used to purchase the land, either to the whole or his equivalent portion of the land." (*Bruce* v. *Roney,* 18 Ill. 67.) Such a trust also "results in favor of one who pays only a part of the price. In other words, where two or three persons together advance the price and the title is taken in the name of one of them, a trust will result in favor of the other with respect to an undivided share of the property, proportioned to his share of the price." 3 Pomeroy's Eq. Jur. sec. 1038; *Hinshaw* v. *Russell,* 280 Ill. 235.

283 – 5

It is the settled rule of law in this State that parol evidence to establish a resulting trust must be clear, strong and unequivocal and must establish the fact of the payment of the purchase money by the alleged beneficiary beyond doubt. (*Dodge* v. *Thomas,* 266 Ill. 76.) While it is true that the statements of a deceased person as to who owned the land may be of such a nature as to base thereon a finding that a resulting trust arose, (*Elliott* v. *Prater,* 260 Ill. 64; *Bachseits* v. *Leichtweis,* 256 id. 357;) yet these declarations must be direct and certain, and, to be controlling, should be corroborated by other facts and circumstances, for courts will not act upon mere declarations if they are conflicting, vague or inconsistent with themselves. (1 Perry on Trusts,—6th ed.—sec. 147.) Of course, it is not the law, as seems to be argued by counsel for appellee, that parol evidence, to establish a trust, must be direct in order to be clear and satisfactory. Circumstantial evidence may furnish satisfactory proof so as to justify holding that a resulting trust arises in favor of the beneficiary on account of the beneficiary's money being used for the purchase of the land. (*Lord* v. *Reed, supra; Dodge* v. *Thomas, supra.*) There can be no question, as already stated, that the money of Eliza, the first wife, was used either in the purchase of the land in question or in paying off some of the indebtedness on it. That seems to be clear beyond peradventure from the statements made by Baughman himself in his own handwriting in his account book, but it is not clear from the memorandum made by him that this money went into the purchase of the land or what particular pieces of property it assisted in purchasing. That memorandum might be as consistent with the theory that he had used a part of the money to pay off indebtedness on the land as it would be with the theory that it went into the purchase of the land. Then, too, the dates when the payments were made, as shown by the memorandum account book of Eliza's father, Seiberling, do not conform at

all with the actual purchase dates of this property. Where
the evidence is doubtful and not clear and satisfactory, or
is capable of reasonable explanation upon any theory other
than that of the existence of an implied or resulting trust,
such trust will not be held sufficiently established to en-
title the beneficiary to a decree declaring and enforcing it.
(*Dodge* v. *Thomas, supra.*) The statements of the wife
in the presence of the husband, at various times, that her
money had purchased the property would be entirely con-
sistent with the fact that her money was used, in part at
least, to pay off the indebtedness on the farm. Then, too,
the statements of the deceased that the money in the land
belonged to his wife, in view of the fact that he managed
and controlled it and the fact that the property stood in his
name, should be received with caution. (*Corder* v. *Corder,*
124 Ill. 229.) Certainly this evidence is not of such clear
and satisfactory character as to leave no doubt in any un-
prejudiced mind that all of the land in section 7 was pur-
chased with the money of Eliza Baughman, as contended by
counsel for appellants. We find no proof of any kind to
indicate that any part of her money went into the purchase
money of the northeast quarter of said section. Neither do
we think the evidence is satisfactory that her money went
into the purchase of the south half or the northwest frac-
tional quarter of said section. The theory that Baughman
considered the title to the land in his wife would hardly be
consistent with his discussion with the children of that wife
as to having them satisfied if he distributed it equally be-
tween them and their half-sister, and there is nothing in
any part of the testimony as to any of these discussions
to indicate that he did not think the title was in his own
name, to do with as he saw fit. Taking all the evidence
in the record together, we can reach no other conclusion
than that it is of so uncertain a character as to any specific
amount of Eliza Baughman's money being a part of the
purchase money of the land at the date of its purchase, that

it must be held that the decree of the circuit court was correct in that regard.

The ante-nuptial agreement was executory and was not binding upon the parties so far as the rights of Pearl Baughman were concerned, she being a minor at her father's death. *Zachmann* v. *Zachmann,* 201 Ill. 380; *Phelps* v. *Phelps,* 72 id. 545.

The marital rights of the husband or wife will not be taken away by an ante-nuptial agreement unless the intention to do so is clearly apparent. (*Dunlop* v. *Lamb,* 182 Ill. 319.) The provision of said ante-nuptial agreement upon which counsel for appellants apparently rely, seems to be the following: "We or each of us understand and solemnly hereby agree that as S. E. Baughman may wish or see fit or his administrators or assigns shall give S. E. Baughman's children and heirs all of his property by will or in any other manner as S. E. Baughman may desire or direct, except an amount necessary to care for Miranda Ellen, his wife, as above set forth." This language would indicate that it was only binding if Baughman himself desired to dispose of his property otherwise, and it is evident from this record that he had no such clear desire that he attempted to carry out. It would seem necessarily to follow that he preferred that the law should take its course and the Statute of Descent should govern and regulate as to the distribution of his property. This being so, it is unnecessary for us to consider or decide the question whether or not the contract was executed in such a manner as to be binding upon the wife.

The decree of the circuit court will be affirmed.

*Decree affirmed.*