(No. 12148.—Decree affirmed.)  •

SALLIE BROWNING OREAR *vs.* THE FARMERS STATE BANK AND TRUST COMPANY *et al.* Defendants in Error.— (JULIAN P. LIPPINCOTT, Exr. *et al.* Plaintiffs in Error.)

*Opinion filed February 20, 1919.*

1. TRUSTS—*a resulting trust must be clearly alleged in the bill.* Where a resulting trust is sought to be established and enforced the trust must be clearly alleged in the bill, not only in terms, but the specific facts constituting the substantial groundwork of the case should be stated by positive and unambiguous averments.

2. SAME—*parol evidence to establish a resulting trust must be clear, strong and unequivocal.* Parol evidence to establish a resulting trust must be clear, strong and unequivocal and must establish the fact of payment of the purchase money by the alleged beneficiary beyond a doubt, and if the evidence is capable of reasonable explanation upon theories other than the existence of a resulting trust a trust is not established.

3. SAME—*resulting trust does not arise merely from relation of debtor and creditor.* A resulting trust does not arise merely from the relation of debtor and creditor, and it is not enough to show that the debtor owed the creditor and that he afterwards bought land for an amount equal to the indebtedness.

4. SAME—*to establish a resulting trust complainant must identify the fund and the property in which it is invested.* It is essential to prove a resulting trust that the claimant shall be able to prove and identify the specific fund and the specific property in which the fund has been invested, and where only a part of the purchase price is claimed to have been paid, the proof must show, clearly and beyond doubt, the proportionate and definite part paid.

5. SAME—*declarations or verbal admissions to establish resulting trust are received with caution.* Declarations of the grantee holding the legal title to the property, to support a resulting trust, must be definite and certain and should be corroborated by other facts, for courts will not act upon mere declarations if they are vague or conflicting but will receive them with caution.

6. SAME—*express agreement cannot establish a resulting trust.* Parol evidence of an express agreement for the investment of common funds in real estate cannot be relied upon to establish a resulting trust, as it would tend only to establish an express trust, which is within the prohibition of the Statute of Frauds.

WRIT OF ERROR to the Circuit Court of Morgan county; the Hon. NORMAN L. JONES, Judge, presiding.

BELLATTI, BELLATTI & MORIARTY, for plaintiffs in error.

WILLIAM T. WILSON, and WORTHINGTON, REEVE· & GREEN, for defendants in error.

Mr: JUSTICE CARTER delivered the opinion of the court:

Sallie Browning Orear filed her bill in the circuit court of Morgan county April 1, 1915, for the partition of certain real estate. ˙ After the pleadings were settled the cause was referred to a special master in chancery, who reported in favor of complainant and recommended that the ·prayer of the bill be allowed. The exceptions of the defendants in error to the report of the master were sustained by the chancellor and a decree was entered dismissing the bill for want of equity. From that decree this writ of error has been sued out.

The bill alleges that complainant and D. Rees Browning, her brother, entered into an equal co-partnership agreement for the conduct of their business and financial affairs many years ago, whereby it was mutually agreed that they should contribute into a common fund a sum of money then agreed upon and should thereafter both devote their time and business abilities to the conduct and management of the partnership affairs, said capital and all the profits and accumulation to be owned by them as equal partners; that pursuant to said agreement they both contributed the amount of money agreed upon and for years devoted all their time, services and ability to the conduct of the various partnership affairs and business ventures and to the accumulation of money and property for the advantage and benefit of both; that they were fairly successful in their business ventures, and that the money thus accumulated they from time to time by mutual agreement invested in real estate, of which the title· was taken, for convenience,

in the name of Rees; that Rees died May 23, 1914, having in his name 640 acres of land in Sangamon county which had been purchased some years previous to his death from Edward W. Brown and wife, the purchase price being paid out of the partnership funds; that the equitable and beneficial interest in said real estate vested in Rees and complainant as equal partners; that they never had an accounting as to their partnership affairs; that Rees left a will, which had been duly proved and admitted to probate, and that the Farmers State Bank and Trust Company was appointed and had qualified as executor; that complainant and the bank were seized of all the real estate described in the bill in fee simple, as equal tenants in common.

The answer of defendants in error admits the death of D. Rees Browning and the qualification of the executor but denies the material allegations of the bill, and alleges that Rees purchased said land with his own money and that no part of the land was purchased with the money of complainant. It denies that complainant is the owner of any portion of said land; alleges that she is barred by the Statute of Frauds; that she accepted the annuity under her brother's will and is now estopped to make the claim set forth in her bill.

Since the decree was filed in the lower court Sallie B. Orear has died testate, her death having been suggested of record. Her surviving husband and the executor of her will have brought the cause to this court by writ of error.

The evidence heard before the master shows that D. Rees Browning came to Jacksonville, Illinois, from Kentucky about 1873; that later his brother, Marcus E. Browning, Jr., joined him in Jacksonville; that Rees obtained a position in a bank and Marcus at first clerked in a store; that thereafter, at the suggestion of Rees, the father, mother, sister (the complainant) and two aunts came to Jacksonville and rented a place called in the record the Adams place, where they and the two sons all lived together. The

evidence tends to show that the father was in very poor financial circumstances at the time; that the two aunts, sisters of the father, each had a few thousand dollars, apparently secured by mortgages on property in Kentucky; that a few years after the family came to Jacksonville they moved onto a small farm known as the Hitt place, just out of the city, where Marcus managed a small truck farm, garden and dairy; that complainant (then Sallie Browning) managed the house in which they all lived as one family and assisted Marcus in carrying on the truck farm and dairy; that Rees lived and boarded during these years with the family, and it is apparent from the evidence he was the controlling factor in family affairs. Plaintiffs in error argue the evidence tends to show that during these years the receipts from Rees' salary and from the farm were all turned into a common fund, the bank account usually being kept in Rees' name and checked out by him for the family expenses and other payments. The evidence, however, shows that in the eighties Marcus for some years had a bank account, as did also complainant for a short time. The evidence tends to show that Marcus and the sister trusted largely to Rees as to their business affairs and that he was largely in control of the money disbursements of the family; that Marcus sometimes transferred the funds deposited to his account to Rees' account; that about 1887 the place called the Wiswell place was purchased by the Brownings and the title taken in the name of Marcus, although the evidence shows that Rees did all the business, and there is some evidence tending to show that he actually purchased the land for himself and suggested that the title be taken, for convenience, in Marcus' name. A partial payment was made on this purchase and the balance was secured by notes signed by the two brothers and the two aunts, complainant's name nowhere appearing of record as to this purchase. The family moved from the Hitt place to the Wiswell farm, and there is evidence tending to show

that Marcus continued to carry on his dairy and truck business at the new home. The evidence on behalf of plaintiffs in error also tends to show that the business during these years on the Hitt and Wiswell places was conducted as a partnership between the two brothers and the sister until the death of Marcus, in 1898, and that thereafter by agreement the partnership was continued between complainant and her brother Rees. About two years after the purchase of the Wiswell place a piece of land adjoining was purchased and the title taken in Marcus' name, the business in connection with the purchase being conducted by Rees, there being some evidence tending to show that he was the actual purchaser and that at his suggestion the title was taken in his brother's name. There is no evidence tending to show that the father, Marcus E. Browning, Sr., ever took an active part in the business affairs of the family after they moved to Jacksonville or furnished any of the money put into these lands. The father died January 13, 1895, and the son Marcus died intestate September 19, 1898, holding at that time the title to the two pieces of property in his name, leaving his mother, brother and sister his only heirs.

The evidence shows that on September 5, 1892, Henry C. Hammond and wife conveyed to D. Rees Browning a lot in College Grove addition to Jacksonville, and that on March 22, 1899, J. H. Osborne, receiver, in consideration of $10,660, conveyed to Rees 164 acres of farm land in Morgan county, $3000 being paid in cash and the balance being evidenced by five promissory notes secured by incumbrance on the property. The evidence tends to show that the money for this purchase price and to pay the notes thereafter was furnished by Rees, the argument of counsel for plaintiffs in error being, that while this money was paid by him it was taken out of the accumulated profits of the partnership business carried on by him and his sister. The record further shows that William Berchtold conveyed to Rees on March 1, 1901, 80 acres of farm land in Mor-

gan county for the consideration of $4700 paid in cash and
the assumption of a mortgage on the farm for $1500 and
interest. The entire business as to the purchase of this
property the evidence shows was carried on by Rees and
the money was paid by him, it being also argued here by
counsel for plaintiffs in error that this money was taken
out of the accumulated profits of the partnership business
of complainant and her brother.

In 1893 D. Rees Browning and his aunt Eveline Rees
held a mortgage on 240 acres of land in Morgan county
belonging to Dr. L. W. Brown securing two notes,—one
for $11,000, payable to D. Rees Browning, and one for
$7000, payable to Eveline Rees. Thereafter, on December
5, 1896, Dr. Brown paid this mortgage debt by a convey-
ance of said 240 acres to Rees, and a few days thereafter
Rees executed an agreement to re-convey to Dr. Brown
said premises at any time within four years upon the re-
payment of $18,000, with interest thereon, and any taxes,
costs and expenses paid by Rees in the interim. Rees did
not become vested with the full title to the 240 acres until
the expiration of the optional agreement.

The evidence shows that in the year 1888 Caroline and
Eveline Rees, the two aunts of D. Rees Browning, made
their wills, whereby each left her property to her sister, and
in the event of the death of the sister to her nephews, Rees
and Marcus, and niece, Sallie, or the survivors; that Rees
was appointed executor in both these wills; that he settled
both estates in court, and his final account in each was ap-
proved in court and he was discharged. Caroline Rees
died in 1889. The evidence tends to show that her estate
was worth something over $10,000, and that $7000 of this
was loaned to Dr. Brown on the note heretofore referred to.
This note was introduced in evidence and bears on it the
following indorsement: "For value received I hereby as-
sign the within note to D. Rees Browning.—Jan. 11, 1893."
Signed, "Eveline Rees," the signature being proved to be

genuine. On March 28, 1900, Rees conveyed 64 acres of the land purchased by him from Osborne to Eveline Rees, the evidence not showing whether or not this conveyance was a part of the settlement of the estate of the twin sister, Caroline. Eveline died testate June 14, 1903. The inventory filed in that estate showed that she owned only said 64 acres of land. We find no basis in the record for the claim of counsel for plaintiffs in error that Eveline Rees must have been worth at her death approximately $35,000 or $40,000 and that Rees failed to account for all of her property in the county court. The records of the county court of Morgan county show that Rees was discharged and his final account in said estate approved, and we see no reason, from anything shown in this record, to indicate that he misappropriated any of his aunt's estate. The evidence also shows that Angeline Browning, the mother of the three Browning children, inherited from her son Marcus one-half of all his property, and that on January 18, 1901, she conveyed all her undivided interest in said son's real estate to Rees and Sallie Browning.

On July 8, 1905, D. Rees Browning and Edward W. Brown made a trade of certain farm lands owned by Rees in Morgan county, amounting to 484 acres, consisting of the 240 acres theretofore deeded to Rees by Dr. Brown, the 80 acres purchased by Rees from William Berchtold and the 164 acres purchased of Osborne, for the 640 acres of land in Sangamon county described in the bill of complaint. They apparently traded 484 acres owned by Rees for 484 acres of said 640, acre for acre, and Rees paid for the additional 156 acres the sum of $20,000 in cash and by a note secured on the premises, which note, the evidence tends to show, was afterwards paid, as was the original cash payment, by Rees. There is no evidence that in any way indicates that the complainant had anything to do with this transaction as to trading these lands or which tends to show that any of her money was a part of the

$20,000, except the general claim of counsel that this sum was a part of the accumulated profits of the alleged partnership. It may be noted in this connection, however, that about the time of this trade between Brown and Rees for the 640 acres, the record shows that complainant invested $10,000 in a mortgage note which was purchased for her through certain bankers. There is evidence tending to show that Rees had advised her with reference to this transaction, and at about the time of this investment gave her two checks,—one for $2428.54 and the other for $1075. Counsel for defendants in error argue with force that this investment made for complainant at this time tends strongly to show that none of her money was invested in the lands here sought to be partitioned.

Complainant married Thomas B. Orear in 1904. Rees married Ella Headley on February 17, 1910. A marriage contract was executed between Rees and his future wife prior to the marriage. For years before this marriage Miss Headley and the sister, Sallie, had been warm personal friends, and at the time the marriage contract was entered into she was the guest of Sallie and her husband at St. Petersburg, Florida. The evidence tends to show that the provisions of the marriage contract were talked over by Sallie, Miss Headley and Rees before it was entered into, although the evidence does not show that Sallie had ever seen the contract itself. This marriage contract sets forth that Rees is the owner of 640 acres of land in Sangamon county and other property. By it he agrees to convey to his future wife, before the marriage, land in College Hill addition to Jacksonville, and also agrees, upon the consummation of said marriage, to execute a will providing that his widow shall receive during the joint lives of herself and his sister, Sallie, one-half of the net annual income of testator's farm lands, and in the event she shall survive Sallie she shall have the whole net income of the farm for the balance of her life; that his widow shall have

power to dispose of one-fourth in value of the farm lands, subject to the life interest of Sallie, and that the widow shall have $1000 widow's award. These provisions in the ante-nuptial agreement were to be in full of all her rights under the law, including dower, homestead, widow's award and the right to inherit. The evidence tends to show that Rees' widow had no notice, until after his death, that Sallie claimed any interest in the farm lands, although Sallie claimed to have told her she had such an interest. Sallie did not attend the marriage of her brother, although invited. The evidence tends to show that she had never been on friendly terms with him since the marriage, and there was considerable correspondence between Sallie and Rees with reference to these differences. After his marriage Rees changed his will as to details by codicils but not as to the main plan. The will of Rees, as modified by two codicils, provides that after the payment of the debts, funeral expenses and $1000 widow's award all his personal property and all his real estate in Jacksonville shall be divided equally between his widow and Sallie absolutely and in fee simple; that all the farm lands are to be held intact during the lives of the widow and Sallie and the survivor of them and the net income divided equally between them, the survivor to have the whole income during the balance of her life, and provided that the amount received by the widow from the net income should not be less than $2500 per year. The will further provided that the widow and Sallie should each have the privilege of disposing by will one-fourth in value of all of the testator's farm land. A trust was established to carry out the provisions of the will, and a considerable portion after the death of the widow and Sallie was bequeathed to various charities.

The evidence shows that at the time of her brother's death complainant owned some $20,000 in securities besides owning the home property, half of which had been deeded to her at her marriage by her brother Rees. She

offered evidence tending to show that after her marriage her husband had given her some $4000 in money, which it is claimed was a part of the securities she owned at her brother's death. Defendants in error offered evidence which tended to show that the money given to complainant by her husband after their marriage was used by her for paying her own or family expenses and was not invested in any securities, and there is no direct proof of any kind in the record that tends to show that she did invest any of the money given by her husband in any of the $20,000 securities. There is evidence also showing that within a few years after her marriage she made certain loans of money to her brother Rees, which he re-paid her later.

The principal evidence relied on by plaintiffs in error to sustain the claim that complainant was entitled to a half interest in said real estate is the testimony of certain relatives of the Browning family who resided in Kentucky,— John S. Reese (a cousin of Sallie and Rees) and his wife and two sons. John S. Reese testified that he had been all his life a very intimate friend of D. Rees Browning; that they went to school together and that Rees had frequently visited the witness in Kentucky, and that on more than one occasion Rees told the witness that the accumulated profits of the dairy business carried on by Marcus and Sallie and the money saved from the salary of Rees had been invested from time to time in land; that they were saving all the money they could and buying land in small parcels; that the land had been deeded to Rees for convenience in making out papers; that Sallie and Marcus had been in full partnership with Rees in the ownership of these lands until the death of Marcus and thereafter Sallie was full partner with him; that his sister did as much work and had as much to do with saving the money that went into these lands as anyone, and that, in substance, she was the equitable owner of half of the lands; that Rees said this to witness many times, the last time not

later than six or seven years before his death. The wife of this witness, Anna Reese, also testified to hearing several statements by D. Rees Browning substantially to the same effect as testified by her husband. Their two sons, Chester and Wallace, testified to a conversation between Chester and D. Rees Browning about 1900, on a visit Rees made to them in Kentucky, in which Rees stated to Chester that it was not all due to his efforts, alone, that he had accumulated so much land and property, but that the money that went into the land was the accumulated efforts of himself, his brother and sister, and that Sallie had worked as hard as he had and was full partner in everything he owned; that she had been very frugal and had frequently gone without the necessities of life to help pay for the land and that they owned it together; that this statement of Rees was in answer to a question of the witness as to how it happened that he had been able to accumulate so much property on such a moderate salary during all the years that he had been living in Morgan county, Illinois. Wallace testified to having heard this conversation substantially the same as his brother testified. Another witness, Elvira Neighbors, apparently a housemaid in the Browning family, testified that Rees stated in her presence that Sallie was an equal partner with him in all of his business affairs and owned half of the property that stood in his name; that "Sally had worked like a slave." The evidence shows that during all these years the various pieces of real estate standing in the name of Rees were managed and controlled by him as if they belonged to him solely, and there is no evidence in the record directly tending to show that Sallie had any legal or equitable interest in any of these properties, except the testimony of the Kentucky relatives and the housemaid.

Counsel for defendants in error argue earnestly and at length that the allegations of the bill are not of such a character as to sustain a decree that a resulting trust for

the benefit of plaintiffs in error could be established in any part of this property. They also argue in that connection that the allegations of the bill and the proof do not correspond; that the proof tends to show that if there was any partnership it existed between Rees, Marcus and Sallie before the death of Marcus, and that the allegations of the bill are to the effect that the partnership was formed and existing between Rees and Sallie only. The law is clear that where a resulting trust is sought to be established and enforced "the trust must be clearly alleged in the bill, not only in terms, but all the facts must be set out from which the trust is claimed to result;" (1 Perry on Trusts,—6th ed.—sec. 137;) that the pleader should state in his bill the specific facts constituting the substantial groundwork of his case, and not loose or general conclusions from those facts nor mere matter of argument; that the averments should be positive, certain and unambiguous. (1 Whitehouse on Eq. Pr. 191; 16 Cyc. 221.) It must be admitted that the allegations of the bill do not correspond fully with the proof presented in support thereof by complainant and that the allegations of the bill are not as certain, clear and specific as has sometimes been required. In view, however, of the conclusions that we have reached on the merits, we will assume for the purposes of this case that the allegations are sufficient to sustain, if the proof justified, the establishing of a resulting trust for the benefit of complainant. Furthermore, we do not deem it necessary, in view of the conclusions reached, to discuss the question whether the allegations and the proof correspond. Waiving that question, we can reach no other conclusion on the merits than that the proof does not establish a resulting trust in D. Rees Browning for the benefit of complainant. "The policy of the law requires that everything which may affect title to real estate shall be in writing; that nothing shall be left to the frailty of human memory or as a temptation to perjury, and wherever this policy

286 — 30

of the law has been broken in upon and parol evidence admitted, the courts have been ever careful to examine into every circumstance which may affect the probability of the alleged claim, as the lapse of time, the means of knowledge and circumstances of the witnesses, and will not grant the relief sought where the claim has been allowed to lie dormant for an unreasonable length of time or where the evidence is not very clear in support of the alleged right, especially where no claim has been set up during the lifetime of the trustee but is raked up and charged against the heirs, who may not be supposed to know anything about it or be able to defend it as their ancestor might have done." (*Enos v. Hunter,* 4 Gilm. 211.) It is also the settled law of this State that parol evidence to establish a resulting trust must be clear, strong and unequivocal and must establish the fact of payment of the purchase money by the alleged beneficiary beyond a doubt. (*Dodge* v. *Thomas,* 266 Ill. 76.) A resulting trust does not arise merely from the relation of debtor and creditor. It is not enough to show that the debtor owed the creditor and that he afterwards bought land for an amount equal to the indebtedness. It is essential to prove a resulting trust that the claimant shall be able to prove and identify the specific fund or property invested and the specific property in which it has been invested. "He must be able to trace and identify the fund from its origin to the final investment. The fact that the fund may be money does not relieve him from this necessity. * * * It is not necessary to trace the particular coins or bills, but the fund must be capable of identification as a fund distinguishable from all other money or the right to pursue it must fail." (*Moore* v. *Taylor,* 251 Ill. 468.) Where the evidence is doubtful and not entirely clear and satisfactory, or is capable of reasonable explanation upon a theory other than that of the existence of an implied or resulting trust, such trust will not be held to be sufficiently established to entitle the beneficiary to a

decree declaring and enforcing it. (*Stephens* v. *St. Louis Union Trust Co.* 260 Ill. 364; *Goelz* v. *Goelz,* 157 id. 33.) If the evidence is capable of reasonable explanation upon theories other than the existence of a resulting trust a trust is not established. (*Briscoe* v. *Price,* 275 Ill. 63.) If a trust arises in favor of one who pays only a part of the purchase price, the proof must show clearly and beyond doubt the proportionate and definite part paid by the claimant. (*Baughman* v. *Baughman,* 283 Ill. 55.) Declarations of the grantee holding the legal title to the property, to support a resulting trust, must be direct and certain, and to be controlling should be corroborated by other facts and circumstances, for courts will not act upon mere declarations if they are vague, conflicting or inconsistent. (*Baughman* v. *Baughman, supra;* 1 Perry on Trusts,—6th ed.—sec. 147.) Such declarations or verbal admissions are always received with caution. (*Corder* v. *Corder,* 124 Ill. 229.) "With respect to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting, as it does, in the mere repetition of oral statements, is subject to much imperfection and mistake, the party himself either being misinformed or not having clearly expressed his own meaning or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say." (1 Greenleaf on Evidence,—15th ed.—sec. 200.) This same rule was laid down in *Bragg* v. *Geddes,* 93 Ill. 39. Every lawyer of experience has observed the necessity of enforcing this rule, for it often occurs that different persons of equal experience, training, ability and honesty give materially different testimony as to the same statement or conversation.

It is clear from this record that the Reese family,—father, mother and two sons,—testified largely to their con-

clusions as to declarations they had heard made by D. Rees
Browning. A mere reading of their testimony discloses that
it was impossible for them, years after they had heard the
declarations, to remember the exact language used by Rees.
They did not claim that they knew what special pieces of
land he was referring to or how many pieces, and while
they were not at all certain as to the dates of most of these
declarations, it is apparent that the majority of them, at
least, must have been made years before Rees purchased
the land in Sangamon county here in question. The wis-
dom of the rule given by Greenleaf as to receiving such
declarations or admissions with caution is well illustrated
in this case in applying this rule to the testimony of the
cousin, John S. Reese. It is conceded by counsel for plain-
tiffs in error that it was impossible for that witness to re-
member any dates with accuracy; that he could not even
give the date of his own birth or marriage. It will not do
to argue in support of his testimony that it is reliable even
though he could not remember the dates with certainty, for
he not only was mistaken as to dates but also as to some
of the material facts testified to by him. He stated that
the Browning family came to Illinois to invest their funds
in lands, when the evidence clearly shows that the elder
Browning was in financial distress at the time his family
moved to Illinois, and that they were largely, if not wholly,
dependent upon the earnings of Rees for their support, and
their expenses in coming to Illinois were paid by Rees. Ob-
jections might be made as to the testimony of the wife of
John as to a declaration of Rees, made apparently before
the purchase of the present lands while the other two pieces
stood in the name of Marcus, to the effect that Rees stated,
"Sallie and I will be equal partners in our lands." Even
conceding that Rees stated this to her, what lands did he
mean? Sallie and Rees would, of course, be partners in
any lands that he might rightfully call "our lands," and
this might mean only that they were partners in the lands

standing at his death in the name of the brother Marcus, but this would not be equivalent to saying that they were partners in all the lands that stood in Rees' name.

The case in behalf of plaintiffs in error is based largely, if not wholly, upon the evidence of verbal statements or admissions said to have been made by D. Rees Browning many years before the bill was filed. He was a resident of Jacksonville forty years or more. He had held offices in three of its banks, at one time had been assistant postmaster, and there is no positive proof by any witness, outside of these alleged declarations, showing that there was a partnership existing between Rees and his sister, Sallie. His alleged statements that she was a partner with him and that she had done as much work as he and had worked like a slave are not in harmony with all the testimony in this record. There is testimony tending to show that she was in charge of the house when the family lived together on the Hitt place and afterwards on the Wiswell place, where her brother Marcus was running a dairy and carrying on a truck farm, and that she helped Marcus in this work. There is also testimony in the record tending to show that she was during these years quite a leader in society matters, and the evidence shows, without contradiction, that during some of these years she made frequent trips to St. Louis and to visit her relatives in Kentucky. Many of these alleged admissions were made at a time when the record does not show that Rees had any real estate standing in his name. The first piece taken in his name was a lot in the city of Jacksonville purchased in 1892. The next was purchased by him in March, 1899, and was a part of the land traded for the 640 acres of Sangamon county land. While it is true he purchased two other pieces of land previous to this last date, those pieces were put in the name of his brother Marcus and stood in his name at the time of his death, in 1898. The 240 acres of land obtained by Rees from Dr. Brown, which were

included in the trade for the section in Sangamon county, were not fully acquired by him until about 1900, and most, if not all, of these alleged declarations or admissions were made before that date. In 1905 Mrs. Orear and her husband conveyed to Rees her interest in the 64 acres of land which she had acquired from her aunt Eveline, and the year previous, in January, 1904, he had conveyed to her his interest, inherited from his brother Marcus, in the Wiswell place, where she lived, consisting of 21 acres and a twelve-room house, on the west side of Jacksonville. There is no evidence in the record to show that there was any written memorandum, partnership books or other writing as to any partnership between Sallie and her brother, or that she had ever made any claim before his death, publicly, that she had any equitable interest in the lands that stood in his name. No excuse that we deem satisfactory is shown for her delay in waiting until his death to make such claim and for her acceptance of a part of the annuity left to her in his will before making any claim as to the real estate. Her counsel attempted to make an explanation in the briefs upon the ground that Rees had control of his sister's property; that she had great confidence in him; that after the purchase of the Sangamon county land, in 1905, he had said nothing to her denying her right to a half interest in the land, and that because of the confidential relations between them this delay was justified. Whatever the relations between Mrs. Orear and her brother had been previous to his marriage, in 1910, the evidence shows, without contradiction, that they were estranged after that time; that she did not even attend his wedding, and apparently from that time, judging by the correspondence between them, they kept at arm's length, and she had over five years after his marriage to institute legal proceedings in his lifetime and failed to do so.

We do not think the record justifies the argument of counsel for plaintiffs in error that D. Rees Browning had

control of his sister's property and managed and controlled it entirely until his death. The record, on the contrary, tends to show that he bought securities for her, turning them over to her, and that he always treated her, with reference to the ownership of this land, the same as he would have treated a person to whom he was in no way related. There is no positive proof that from the purchase of the land here in question, in 1905, to the day of his death, he ever made a declaration to anyone to the effect that his sister had any interest in said section of land. Indeed, Sallie admitted as late as 1914 that he had told her, when he was talking about marrying Ella Headley, in 1910, that he intended to divide his estate equally between Sallie and his future wife, and that she (Sallie) then thought that was all right. It is very clear that at that time Rees claimed that he owned this land, and it is manifest that his sister so understood him.

The reasoning of this court in *Keuper* v. *Mette,* 239 Ill. 586, *Moore* v. *Taylor, supra, Gillette* v. *Plimpton,* 253 Ill. 147, *Wells* v. *Messenger,* 249 id. 72, and *Baughman* v. *Baughman, supra,* would tend strongly to uphold the view that the evidence in this case does not establish a resulting trust in complainant. While, of course, the facts in none of those cases are exactly similar to those in this case, yet there can be no question that the facts tending to show a resulting trust in some, if not all, of those cases were as strong, or stronger, than the facts tending to show a resulting trust in this case. "In order to establish an adverse equitable title it is essential that the evidence of such title should be clear and unequivocal and lead to but one conclusion. It is also a settled rule with courts of equity that legal titles will not be disturbed after a long lapse of time where parties, with full knowledge of the facts, make no effort to have their rights declared. There is added force to the rule where the delay has been so long that the death of witnesses and loss of evidence render it practically im-

possible to make a defense. * * * In this case the complainant delayed until everyone who could have testified to the actual relations of the parties and the controlling facts was dead." *Gillette* v. *Plimpton, supra,* p. 152.

Even if we waived the defense of *laches* and estoppel urged at length and with citation of numerous authorities by counsel for defendants in error, we can reach no other conclusion than that the evidence in this case is not of such clear and satisfactory character as to leave no doubt in any unprejudiced mind that a half or any other definite portion of the money used to purchase the section of land belonged to Sallie Browning Orear. Taking all the evidence in the record, the conclusion seems to be inevitable that the evidence is uncertain and indefinite as to any specific amount of Sallie's money, if any at all, being a part of the purchase money of the land at the date of its purchase. Moreover, it may be said in this connection that there is much force in the argument of counsel for defendants in error that the testimony in the record tends much more strongly to support an express trust, if any at all, than it does a resulting trust. The allegations of the bill and the proof on the part of plaintiffs in error, so far as it tends to prove anything, tends to show that there was an express oral agreement made between D. Rees Browning and his sister that she should have an interest in the lands purchased by him. The allegations of the bill are to the effect that this promise or agreement was made entirely separate and distinct from the partnership agreement. It was clearly an express agreement for the investment of their funds in real estate and was therefore squarely within the prohibition of the Statute of Frauds, and therefore there can be no recovery under such an agreement, as that would be contrary to such statute. (*Godschalk* v. *Fulmer,* 176 Ill. 64; *Williams* v. *Williams,* 180 id. 361; *Ryder* v. *Ryder,* 244 id. 297.) This seems to be conceded by counsel for the plaintiffs in error, and they rest their case entirely upon the claim

that the proof established a resulting trust in favor of the complainant.

We have not attempted in the discussion of the law in this case to refer specifically to all the numerous authorities cited and relied upon by counsel.   We have referred to those, however, that appeared most nearly in point on the questions involved.

The record not showing clearly and satisfactorily that a resulting trust was established, the decree of the circuit court must be affirmed.                    *Decree affirmed.*