AGNES STEPHENSON

*v.*

ANNIE MCCLINTOCK *et al.*

*Filed at Ottawa May 12, 1892.*

1. RESULTING TRUST—*whether it arises.*  A resulting trust arises, if
at all, the instant that the deed is taken out and the legal title vests in
the grantee.  No oral agreements, and no payments before or after the
title is taken, will create a resulting trust, unless the transaction is such,
at the moment the title passes, that a trust must result from the trans-
action itself.

2. If several pay the consideration and take the title to one of their number, a trust will result to them jointly. In such case it is essential, however, to the creation of the trust that it shall appear that the sums severally contributed were for some distinct interest or aliquot part of the estate, as, one-half, one-quarter, etc.

3. SAME—*evidence—verbal declarations as to contract in respect to an interest in land.* Although the verbal declarations of a party are not competent evidence to prove a contract to give another an interest in land held by him, they are competent, in connection with other evidence, to prove that he purchased the land with money in part belonging to such other person, and the extent of that part.

4. Where a person has purchased land taking the deed to himself absolutely, his acknowledgments and admissions are competent evidence to show whose money was used in making the payments for the land, for the purpose of showing a resulting trust in favor of the person a part of whose money was used.

5. SAME—*presumption as to the character of the payment.* Where a mother lets her son have a money draft, which he uses in the purchase of land, if she was the owner of the same in her own right, the presumption, in the absence of other evidence, will be, that the mother has sold or loaned the draft to the son. But when it is shown such draft is treated by all the family of the mother, and herself, as money belonging to the deceased father's estate, the son so receiving and using the same will be treated as a trustee for the other members of the family.

6. SAME—*family working together—relations existing—proceeds as a trust fund.* Where a sister labors on a farm rented by her brother, it will be inferred that she is laboring for him, and, at most, their relations will be that of debtor and creditor; but when it is proved that they and their mother lived together as a family, and all worked together for the common store, and it was agreed between them that the brother and sister should have an equal interest in the proceeds of their mutual labors and the property thereby purchased, the presumption of debtor and creditor will be rebutted, and the brother, in renting, cultivating and purchasing the land, and in paying the money derived from the proceeds of the use of the land, and through their mutual labors, on the contract of purchase, will be acting as the agent and trustee for his sister, as well as for himself.

APPEAL from the Circuit Court of Winnebago county; the Hon. JAMES SHAW, Judge, presiding.

Messrs. GARVER & FISHER, for the appellant:

A resulting trust arises, in case of a joint purchase, in proportion to the consideration paid or furnished. *Seaman* v.

*Cook,* 14 Ill. 501; *Harris* v. *McIntyre,* 118 id. 287; *Reynolds* v. *Sumner,* 126 id. 58.

If there is any doubt about the amount appellant had paid toward the purchase of the land in question, it is the fault of James McClintock, and his heirs can not be allowed to derive the benefit therefrom. A trustee or agent can derive no advantage from the confusion arising from his own fault in mixing his private funds with the trust property, and it becomes the duty of the trustee to show how much belongs to himself—to him separately. *Seaman* v. *Cook,* 14 Ill. 505.

The mingling of trust funds with his own private funds, in the purchase of land, will not avail a trustee to prevent a resulting trust, for according to the usual rule on the subject of confusion, it becomes the duty of the trustee to establish how much of his own money went into the purchase, or the *cestui que trust* will take the whole. Hill on Trustees, 143, note; *Ward* v. *Armstrong,* 84 Ill. 156; *Henschel* v. *Mamero,* 120 id. 660.

Declarations are competent in favor of appellant to show a resulting trust. *Williams* v. *Brown,* 14 Ill. 202; *Harris* v. *McIntyre,* 118 id. 277; *Coates* v. *Woodworth,* 13 id. 659; *Breit* v. *Yeaton,* 101 id. 267; *Bruce* v. *Roney,* 18 id. 67.

Whether there is an agreement or not, a trust arises when the consideration is given or paid by another. *Smith* v. *Smith,* 85 Ill. 189; *McNamara* v. *Garrity,* 106 id. 386.

A trust arises in favor of the party whose money paid for the land, even with or without agreement, or even without his knowledge. *Harris* v. *McIntyre,* 118 Ill. 287; *Bruce* v. *Roney,* 18 id. 67; *Newton* v. *Taylor,* 32 Ohio St. 412; Hill on Trustees, 142, note.

While the evidence of a resulting trust must be clear, yet when there is proof of money paid and the declarations of the party, it is sufficient and competent evidence. *Latham* v. *Henderson,* 47 Ill. 186; *Perry* v. *McHenry,* 13 id. 227; *Seaman* v. *Cook,* 14 id. 501; *Tyler* v. *Daniel,* 65 id. 318; *Springer* v. *Springer,* 104 id. 552; *Hunter* v. *Dennis,* 112 id. 569.

Where the widow got the deed of the land held by her deceased husband under an agreement, it was held she was a trustee for the heirs.   *Musham* v. *Musham,* 87 Ill. 81; *Stave* v. *Kimball,* 28 id. 93; *Hunter* v. *Dennis,* 112 id. 509.

Mr. CHARLES A. WORKS, for the appellee:

In the case of *Reed* v. *Reed,* 135 Ill. 482, this court has announced the following doctrine: "A trust will not result to one who pays a part, only, of the purchase money of land conveyed to another, unless it be some definite part of the whole consideration, as, one-half, one-third, or the like; and the trust can only arise from the original transaction at the time it takes place, and at no other time.   The funds must be advanced and invested at the time the purchase is made. A resulting trust can not be created by funds subsequently furnished.   It is not possible to raise such a trust by the subsequent application of the money of a third person in satisfaction of the unpaid purchase money.   The resulting trust must arise, if at all, at the time of the execution of the conveyance."

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

John McClintock, Sr., died in Ireland in 1852, leaving surviving him, a widow, Catharine P., and three children, James, Agnes and John.   They resided together as a family, thereafter, in Ireland, until in 1866, when they removed to Winnebago county, and entered into possession of the quarter section of land which is the subject of this controversy, and thereafter occupied it, as a family, for a homestead, and improved and cultivated it.   The land, at the time they entered into its possession, belonged to James Peters, a brother of Catharine P., who resided in Pennsylvania, but it was under the immediate control of William Peters, another brother of Catharine, who resided in Winnebago county.   The McClin-

tocks took possession of the land under and by virtue of an agreement between William Peters and James McClintock, whereby it was rented to James, and William was to buy the land of his brother, James Peters, and have him convey it to James McClintock, whenever his brother should be willing to sell it. James McClintock was to improve the land, and get credit therefor when the purchase should be made, and meanwhile he was to put in the hands of William Peters all the money he then had and whatever money he should thereafter make from the proceeds of the land, and William Peters was to loan such money, and keep it loaned, at interest, until he should be able to buy the land for James McClintock, when he was to use it in payment therefor. When the McClintocks took possession of the land, Catharine had a draft on a bank in London, England, for one hundred and eighty pounds, sterling, in gold, given for the proceeds of the sale of the property in Ireland belonging to the family. This draft, properly endorsed, was, at or near the time of their taking possession of the land, delivered by James McClintock to William Peters, and he sold it for $1185.89, and retained the money, under the terms of his agreement with James McClintock. When the McClintocks moved upon the land there was on it only a house, and a small tract of cleared land around the house, and they had to clear up and break the greater part of the land that was subsequently under cultivation. Each of the members of the family labored, in clearing and cultivating the land, for the common good of all, and they all labored under the personal control and direction of Catharine. John died intestate in the fall of 1866, and there was no administration upon his estate nor other settlement thereof. After his death the members of the family remained together upon the land, and worked as before. They acquired live stock and farming implements of considerable value, and cleared and reduced to cultivation some fifty or more acres of land, which, being timbered, required much hard labor, and while

this was being done, several sums of money,—the proceeds of the use of the land from the joint labors of all,—were paid by James McClintock to William Peters, under their agreement.

The evidence is clear that Agnes did more than James to make the money which was thus paid to William Peters. Their mother, Catharine, favored James, because she feared that hard labor might aggravate a heart disease with which she thought him afflicted, and compelled Agnes to do the hardest work. Agnes assisted in clearing ground, in plowing, in removing and hauling manure, digging potatoes and shocking grain in harvesting. She milked a large number of cows, fed calves and other stock, etc., and kept things in order, generally, on the farm. James was intemperate in his habits, and in conducting farming operations, careless and wasteful, while she was directly the reverse, and spent less money than he did. The evidence is that James said, in explanation of why Agnes worked so much at the hard labor usually done, in this country, by men, that she had the same interest in what was raised on the farm that he had. Several witnesses testify that James said that Agnes had an interest in the land, and to another witness he stated that their interests were equal. Agnes was married to Adam Stephenson in December, 1874, and she did not, after that, reside with James or upon this land, but James and his mother, Catharine, continued to reside together on the land, she doing the housework and he managing the farm, until in May, 1883, when she died intestate. No administration was ever had upon her estate, but James appropriated to his own use whatever of it, if anything, there may have been.

On the 17th of March, 1882, William Peters purchased the land in controversy from his brother, James Peters, for $9000, and pursuant to his agreement with James McClintock, he had the deed made to the latter, but he caused it to be placed in the hands of a third party, in escrow, to be delivered to James McClintock when he, William, should direct. Before

any settlement was had between William Peters and James McClintock, showing the amount the latter had paid to the former on their agreement, and which should be credited as payments for the land, and before the delivery of the deed to James McClintock, William Peters died intestate.    Subsequently, one of his heirs-at-law filed in the circuit court of Winnebago county his petition for partition of the lands whereof the intestate was seized in fee, alleging therein that the intestate had some interest in the lands in controversy, making James McClintock and Agnes Stephenson, among others, defendants thereto.   James McClintock was duly served with process and appeared and answered, claiming that the lands in controversy were not to be partitioned as part of the estate of William Peters, and he also filed his cross-bill, alleging therein his contract with William Peters; that the lands in controversy were purchased by said William for him, pursuant to that contract; the payments that he had made pursuant to the contract; execution and placing of the deed to himself, in escrow, and praying that the deed be decreed to be delivered to him, offering to make any additional payment the court might find to be due from him on his contract. Agnes Stephenson was not personally served with process in this partition suit, but she was notified by publication, and made default.   She was not made a party to the cross-bill of James McClintock.

On hearing, the court found the facts as to the making of the contract between James McClintock and William Peters to be, in substance, as alleged in the cross-bill; that James McClintock had paid William Peters, pursuant to that contract, sums of money entitling him to a credit on the amount paid in purchase of the land in controversy, which was $9000, so as to leave only $4000 due thereon, and it was decreed that upon the payment of this sum by James McClintock the deed should be delivered to him.   He then borrowed the $4000, securing the loan by a mortgage on the land in controversy,

and paid the amount required to be paid by the decree, and the deed was thereupon delivered to him.

On the 16th of June, 1888, James McClintock was married to Anna . . . . . . . ., who was the mother of a child born January 4, 1888, called Katie McClintock, begotten out of wedlock, as she alleged, by James McClintock, and the evidence seems to prove that he acknowledged the child to be his. On the 3d of November of the same year James McClintock died, leaving surviving him, the said Anna, as his widow, and the said Katie, as his only heir-at-law. He had made a will before his marriage, but none afterwards. After the marriage of James McClintock, as before, he acknowledged that the interests of himself and Agnes in these lands were equal, and less than two months before his death he and Agnes went to Samuel W. West and requested him to draw papers showing that their interests in the land were equal, but, being busy, he was unable to do so, and requested them to call at another time, when he would draw the required instrument. But that was never done, probably because of the death of James.

It is contended on behalf of appellant, that under these facts there is a resulting trust in this land in favor of appellant. The court below decreed otherwise, and dismissed appellant's bill.

The doctrine is familiar that such a trust must result, if at all, the instant the deed is taken and the legal title vests in the grantee. No oral agreements, and no payments before or after the title is taken, will create a resulting trust, unless the transaction is such, at the moment the title passes, that a trust results from the transaction itself. But if several pay the consideration, and take the title to one of their number, a trust will result to them jointly. It is essential, however, where several contribute to a purchase, in order to create a resulting trust, that it shall appear that the sums severally contributed were for some distinct interest or aliquot part of the estate, as, one-half, one-quarter, etc. (*Reed* v. *Reed*, 135 Ill. 482.) In the present case, we think, while the evidence of

the declarations of James McClintock are not competent to prove a contract to give appellant an interest in the lands, they are nevertheless competent, in connection with the other evidence, to prove that he purchased the land with money in part belonging to her, and the extent of that part. It may be that, technically, the gold draft brought from Ireland was the property of the mother, Catharine, and in that event she could, of course, give or sell it to James, and in the absence of other evidence the presumption from James using it would be that she had either sold or given it to him. But we think the evidence here clearly shows that this draft was regarded and treated by all the family as money belonging to the father's estate, in which all of the family had a legal interest, and so James, in receiving and using it, was a trustee for the others. So, likewise, from the mere fact that appellant labored on a farm rented by James, the inference would be that she was laboring for him, and, at most, their relation would be but that of debtor and creditor. But when it is proved that James and his mother and appellant lived together as a family, and, as one of the witnesses phrased it, "worked for a common pocket-book," and it was understood that appellant and James had the same interest in the proceeds of their mutual labors and the property thereby purchased, the presumption of debtor and creditor is rebutted; and it is established that James, in renting and contracting to purchase the land, and in paying money derived from the proceeds of the use of the land through their mutual labors, on that contract, was acting as the agent and trustee for appellant as well as for himself. His acknowledgments are competent to show whose money he used in making the payments to William Peters, in his lifetime, on account of the purchase of the land; and in admitting that one-half the land was hers, he in effect admitted her money paid for one-half of it, for since he did not claim that he had given it to her or sold it to her, his admission is consistent with no other view.

The evidence shows that but few, if any, payments were made upon the contract with William Peters after the marriage of appellant, and because of the death of William Peters and James McClintock, and the incompetency of Agnes to testify as a witness, it is impossible to ascertain the amount or the origin of the money used in making payment, when each distinct payment, since that of the gold draft, was made. But we think it quite sufficient that the evidence establishes that one-half of the aggregate of the payments made under the contract between James McClintock and William Peters, in regard to the purchase of the land, was money which at the time belonged to appellant, and was in the hands of James McClintock as the agent or trustee of appellant, to be used by him in purchasing an interest in this land for her. How much of it was from the proceeds of sale of animals or grain or other property in which she was joint owner, or how much was hers by inheritance from her brother or mother, is immaterial,—it is only material that the only conclusion to be drawn from the acknowledgment of James McClintock is, it was in fact hers at the time he paid it to William Peters. The one-half the money paid to William Peters on the contract for the purchase of the land being, then, the money of appellant, *eo instanti* the delivering of the deed a trust resulted to appellant in one-half of the land, subject, however, to the burden upon the entire interests in the tract of the mortgage of $4000. See Perry on Trusts, (1st ed.) secs. 127, 128; *Seaman* v. *Cook,* 14 Ill. 501; *Latham et al.* v. *Henderson et al.* 47 id. 185. And see, also, *Blyholder* v. *Gibson,* 18 Pa. St. 137; *Graves* v. *Graves,* 29 N. H. (6 Fost.) 142; *Baumgartner* v. *Grenfield et al.* 38 Mo. 36.

We think the court erred in refusing to decree in conformity with the prayer of the bill, and in decreeing that it be dismissed. The decree is therefore reversed, and the cause is remanded to the court below, with direction to decree in conformity with the prayer of the bill.          *Decree reversed.*