SARAH M. STRONG

*v.*

CELESTIA D. MESSINGER *et al.*

*Filed at Ottawa October 26, 1893.*

1. RESULTING TRUST—*when it arises.* It is a well settled rule that a resulting trust arises, if at all, the instant the deed is taken and the legal title vests. No payment made will create a resulting trust, unless, at the moment the title passes, the trust results from the transaction itself.

2. SAME—*when several contribute the purchase money.* Where several contribute the purchase money, it is essential, in order to create a resulting trust, that it shall appear that the sums severally contributed were for some distinct interest or aliquot part of the estate, as, one-half, one-quarter, etc.

3. SAME—*may be shown by parol evidence.* Parol evidence is admissible to establish facts upon which a resulting trust may be implied by law.

4. SAME—*of the character and amount of evidence required.* The evidence to establish a resulting trust after the lapse of many years must be clear, strong, unequivocal, unmistakable, and of the most satisfactory character. It must establish the fact of payment by the alleged beneficiary beyond a doubt. When the payment of a part of the purchase money is claimed, the evidence must show, in the same clear manner, the exact proportion of the whole price which was paid.

5. On bill filed nearly a quarter of a century after the purchase of land, against the heir and personal representative of the deceased grantee, to have a resulting trust declared and enforced, the principal evidence relied on for relief were the casual admissions of the grantee in conversations with third persons having no interest in the premises, in regard to the equities of the complainant. Such admissions were equivocal, and capable of explanation on the theory of a loan by the complainants, and proof as to the amount of money advanced by the complainants, and showed no claim by them of an interest in the land until after the grantee's death. It was *held,* that the proof was not of that clear and satisfactory character required to establish the trust.

APPEAL from the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

Messrs. CUTTING & CASTLE, for the appellant:

As to the character and sufficiency of the evidence necessary to establish a resulting trust, see *Harris* v. *McIntyre*, 118 Ill. 275; *Enos* v. *Hunter*, 4 Gilm. 212; *Heneke* v. *Floring*, 114 Ill. 554; *Green* v. *Dietrich*, id. 636; *Mahoney* v. *Mahoney*, 65 id. 406; Perry on Trusts, sec. 137.

A trust will not result to one who pays a part, only, of the purchase money of land conveyed to another, unless it be some definite part of the whole consideration, as, one-half, one-fourth, and the like; and the trust can only arise from the original transaction, at the time it takes place, and at no other time. *Alexander* v. *Tams*, 13 Ill. 221; *Olcott* v. *Byrum*, 17 Wall. 44; *White* v. *Carpenter*, 2 Paige, 217; *Botsford* v. *Burr*, 2 Johns. Ch. 405; *Wheeler* v. *Kirtland*, 23 N. J. Eq. 13; *Perry* v. *McHenry*, 13 Ill. 227.

The *laches* of the complainants is a bar to the relief sought. *McDonald* v. *Stow*, 109 Ill. 40; *Breit* v. *Yeaton*, 101 id. 242; *Howe* v. *South Park Comrs.* 119 id. 101; *Lequatte* v. *Drury*, 101 id. 77.

Mr. MILFORD J. THOMPSON, for the appellees:

John Dwyer held confidential relations with appellees, his sisters, for whom he acted as agent. No person will be permitted to purchase an interest in property when he has a duty to perform inconsistent with his capacity as purchaser on his own account. *Allen* v. *Jackson*, 122 Ill. 568; *Railroad Co.* v. *Kelly*, 77 id. 426; *Davis* v. *Hamlin*, 108 id. 39; *Ward* v. *Armstrong*, 84 id. 154; *Beach* v. *Dwyer*, 93 id. 295; Story's Eq. Jur. secs. 323, 328, 332.

When a party purchases land with trust funds, and adds his own funds to the purchase money, a trust will result to the owner of the trust fund employed, and the burden will be upon the trustee to show the amount he embarked in the enterprise, otherwise the *cestui que trust* will take the whole. Perry on Trusts, sec. 128; *Seaman* v. *Cook*, 14 Ill. 501; *Rus-*

*sell* v. *Jackson*, 10 Hun, 209 ; · *McLarren* v. *Brem*, 31 Me. 402 ; *Perisch* v. *Wiggle*, 27 Pa. 247 ; *Brothers* v. *Porter*, 45 Ky. 108.

The defense of *laches* is available only from the time the defendant asserted an adverse claim. *Springer* v. *Springer*, 114 Ill. 550.

Mr. Justice Shope delivered the opinion of the Court:

On June 25, 1868, John Dwyer, appellant's testator, purchased the land in question, and in November following took a deed to the same in his own name, entered into possession, and until his death in 1887, and appellant as his devisee, continued in the uninterrupted control and possession of it as owner. In 1891, practically twenty-three years after the purchase and conveyance, this bill is filed, seeking to establish a resulting trust therein in favor of appellees by parol evidence, showing that they provided the money with which to make the purchase. The bill alleges that they furnished the whole of the purchase price, and seeks to establish a resulting trust in all the land. The court, however, found that they had furnished $2000 of $4160 paid for the land, and decreed that they were the owners in the proportion two thousand bears to four thousand one hundred and sixty, and requiring the administrator and devisee to account for rents and profits.

The rule in this State, as elsewhere, in such cases, is well established. In Pomeroy's Equity Jurisprudence (sec. 1040) it is said : "Where the trust does not appear on the face of the deed or other instrument of transfer, a resort to parol evidence is indispensable. It is settled by a complete unanimity of decision that such evidence must be clear, strong, unequivocal, unmistakable, and must establish the fact of payment by the alleged beneficiary beyond a doubt. Where the payment of a part, only, is claimed, the evidence must show, in the same clear manner, the exact portion of the whole price which was paid." In *Enos* v. *Hunter*, 4 Gilm. 212, it

was held : "As a general rule, the policy of the law requires that everything which may affect the title to real estate shall be in writing,—that nothing shall be left to the frailty of human memory or as a temptation to perjury ; and whenever this policy of the law has been broken in upon, and parol evidence admitted, the courts have been ever careful to examine into every circumstance which may affect the probability of the alleged claim,—as, the lapse of time, the means of knowledge and circumstances of the witness ; and it will not grant the relief sought where the claim has been allowed to lie dormant for an unreasonable length of time, or where the evidence is not very clear in support of the alleged right, especially where no claim has been set up during the lifetime of the trustee, but is raked up and charged against his heirs, who may not be supposed to know anything about it, or be able to defend it as their ancestor might have done." In *Heneke* v. *Floring*, 114 Ill. 558, it is said : "The evidence to establish a resulting trust after the lapse of so many years should be of the most satisfactory character." See, also, to same effect, *Mahoney* v. *Mahoney*, 65 Ill. 406 ; *Corder* v. *Corder*, 124 id. 229 ; *Green* v. *Deitrich*, 114 id. 644 ; *Bragg* v. *Geddes*, 93 id. 40 ; Perry on Trusts, sec. 137 ; Lewin on Trusts, 168.

It is also the settled rule that a resulting trust arises, if at all, the instant the deed is taken and the legal title vests. No payment made will create a resulting trust, unless, at the moment the title passes, the trust results from the transaction itself. Also, where several contribute, it is essential, in order to create a resulting trust, "that it shall appear that the sums severally contributed were for some distinct interest or aliquot part of the estate, as, one-half, one-quarter," etc. (*Stevenson* v. *McClintock*, 141 Ill. 604.) To entitle appellees, therefore, to have a resulting trust in the land in question declared in their favor, the evidence must be so clear and convincing as to satisfy the mind of the chancellor that they contributed to the purchase of the land, or that they paid some portion of

the purchase money for some distinct interest or aliquot part of the same.

Tested by these principles, the evidence, in our opinion, falls short of establishing a resulting trust. A very brief analysis, only, will be necessary.

The purchase was made by John Dwyer of William H. Hanson, and appellees' case rests mainly upon the testimony of Hanson and his wife, aged, respectively, seventy-five and seventy-one years at the time their depositions were taken,— twenty-three or twenty-four years after the transactions about which they testify. John Dwyer, his mother and two sisters, appellees, lived in the State of New York, John and the sisters coming west before this purchase. Hanson testified that Dwyer made the purchase and paid him the money; that while negotiating, it was stated by Dwyer that he wanted the place for a family home, and would not conclude the purchase until his sisters had seen it. They were subsequently brought to the place, and neither Hanson nor his wife testifies to their having taken any part in the negotiations, or to have said anything indicating that they were to have an interest in the property. Hanson testified: "I think the next day after they came the contract was drawn up. No one was present but John Dwyer, Squire Walton and myself." He then testifies that he received all the money from John Dwyer, and delivered him the deed; that "neither of the Misses Dwyer was present on that occasion, and neither was present when I delivered the deed to John." He says, directly, that he sold the farm to John Dwyer, that his conversations were with him, etc. The particular matter in the testimony of this witness relied upon by appellees is as follows: After Dwyer had said he could not take the farm until his sisters had seen it, witness says: "I saw him a few days after, when he brought his sisters up to look at the farm. I had no conversation with them (more) than I naturally would have after their looking around. I remember his saying that the girls were interested in the

farm,—they wanted to make a family home of it.  *  *  *
Dwyer said he wouldn't buy it unless it suited the girls." The
witness, after detailing that the first payment was $2000, and
that he sold subject to a mortgage on the place, which Dwyer
assumed, says that the payment was not made until October,
although the farm was sold in June; that the payment was
offered to him in the house; that Dwyer said to appellee Mary
Dearlove, (after we had figured up the price and interest on
the notes), "Throw out your money;" that Miss Mary Dwyer
(Dearlove) threw the money on the table at the house. "John
took that, and the next day I came down with John, and had
the money counted over, and it was deposited here in the city.
It was Mrs. Dearlove that threw down the money. She took
it off her person. It consisted of small ragged bills in one
package." The witness testified that he had conversations
with John Dwyer in which he said his sisters had earned money
teaching school and working in a dairy,—one had been teach-
ing school and the other working in a cheese factory; that he
often spoke in their favor and what they had been doing, and
made these remarks on the occasion when the money was
thrown out. The money was not counted at the house, but
the next day a package was produced in Chicago by John,
which the witness thought looked like the package thrown on
the table by the sister Mary.

Mrs. Hanson testified to substantially the same thing, al-
though there are discrepancies between her testimony and that
of her husband. She testified that when Mary produced the
money at the house, John said to her, (the witness,) "That
money they earned by teaching school, and other work." She
heard them say nothing about investing it in the farm. They
did say they wanted to make a safe investment of their money.
John always referred to the girls, and seemed to be elated at
their success in making money, and spoke of their making
$60 a month. She testified, also: "Once after the $2000
was paid, John Dwyer said the girls had money to pay into

the place, because, he said, his money was in cattle," but the witness had no recollection how much was said to be in cattle, nor how much they (the sisters) had to pay on the place.

Another witness, Olmstead, testified that Dwyer once came to see him about selling some bonds "in which he said his sisters had an interest, and they were talking about buying a home. I went with him to Preston & Kings. He said they wanted to make a home for themselves by buying this place." When he sold the bonds he paid $500 that he had assumed in the purchase of the farm from Hanson. "He said he wanted the money to pay that note. He didn't say especially how much interest the girls had in the farm, but they were buying it for the girls and himself as a family affair." He also testified that some time before the taking of his deposition,— perhaps five or six years,—Dwyer came to him "in regard to the girls wanting to have a settlement with him, and he spoke of wanting to borrow money to pay his indebtedness. He wanted to sell the place, he said, and go away." He came to witness again, and said he had made an arrangement with Mrs. Dearlove to take his interest in the property for $8000. He considered it worth $12,000, and they could have the difference. After the service of the injunction (1885) he said to witness, they (the sisters) "had a claim on the place, but he had an off-set from the fact that he had taken care of his mother. He afterwards said he wouldn't pay them anything. * * * Up to the time of the injunction he said that the girls had an equity there and he would settle with them." The witness Martindale testified to impressions, only.

The defendant put in evidence the bill filed by Mrs. Messinger, in 1885, against John Dwyer, then in life, seeking, among other things, to charge Dwyer, as trustee, for money due her, a portion of which it was alleged had gone into this land, and praying that he be required to account to her, etc. This bill, it is conceded, was sworn to by Mrs. Messinger, and is inconsistent, wholly, with the present claim of appellees.

Mrs. Messinger went upon the stand, and sought to avoid the force of this evidence by denying, in effect, that she had given the information to her solicitor upon which the bill was predicated, etc. The solicitor who filed that bill, and who had been previously called as a witness by appellees, was recalled by appellant. No objection · was interposed because of his relations to Mrs. Messinger as solicitor. If this witness is to be believed,—and we see nothing in his testimony to discredit him,—he was employed by appellees to collect money that they alleged was due to Mrs. Messinger from John Dwyer. They, at the time, gave him the several items of their claim, consisting of four notes, a claim for one-third of a sum that had been set apart for their mother, a balance collected from an estate in the east, for money upon open account, and aggregating $1931,—and this, he testified, was her entire claim. They made no claim to owning the farm, or any part of it, but did claim that they were entitled to an interest in it because they had done so much and let their brother have money. They were advised that the Statute of Limitations had run against all this claim, and that unless they could trace it into the hands of their brother, as trustee, it could not be recovered. What was done with the money was afterwards talked over, and it being found that part of the money had gone into the land and improvements, the bill was filed as the result; that the bill was read over to Mrs. Messinger, and that she had full knowledge of its contents, and verified it by her oath.

Prior to the death of John Dwyer, all the statements shown to have been made by him and by appellees are consistent with a loan of the money by appellees to Dwyer, and are, as we have seen, inconsistent with any assertion of a claim by them to the land. True, he said to Olmstead and others that his sisters had an equity or interest in the land; but it is apparent that he was speaking as they did to Cunningham, when they said they ought to have an interest in it because they had done so much for it and had let John have money.

He was, as Olmstead says, trying to borrow money to pay his debts; he was going to settle with them; he had a set-off against their claim, in consequence of which he owed them nothing. The testimony of Cunningham, if credited, would seem to leave no doubt that the assertion of claim to the land was an after-thought. He is corroborated by the sworn bill filed in 1885; by memoranda which he testifies he then made, in which their claim is itemized; by the possession and exclusive control of John; by the conduct of appellees, and by the statements to Olmstead and others, which they prove.

But, independently of this view, the testimony of the Hansons is too indefinite and inconclusive to authorize the decree divesting the legal title. Their cross-examinations disclose that they are testifying largely to impressions left upon their minds after the lapse of nearly a quarter of a century, in regard to a matter in which they had no interest, and in regard to which there was nothing to fix or refresh their memories. As said by this court in *Green* v. *Deitrich,* 114 Ill. 644: "It is too unreliable to be made the basis of a decree divesting the legal representatives of a party long since dead, of their legal title to the property. Had he lived, he might have given some explanation to the conversations or admissions given in evidence, or detailed other parts thereof that would have made their meaning better understood." But taking their testimony for all that is claimed for it, it wholly fails to show that appellees paid any distinct or definite part of the purchase money for any specific or aliquot part of the land. Their entire testimony, when considered in the light of other facts shown, is, as before said, consistent with a loan of the money to their brother. After this lapse of time, when the death of John Dwyer has rendered explanation from his standpoint impossible, the fact that Mrs. Dearlove let him have $2000, which was paid on the land, if that fact be conceded; his statements that he was buying the farm for a family home, and would not take it until his sisters had approved of its purchase, and

his loose statements that his sisters had some interest or equity in the land, can not overcome the presumption arising from the fact that the legal title was vested in John Dwyer, aided by the long continued and exclusive possession and control by him, and the acquiescence, unexplained, by appellees therein. And if we then add the explanation given by the witness Cunningham, and which is entirely consistent with the conduct of appellees, the conclusion seems irresistible that whatever money appellees let their brother have was a loan, to be repaid by him, and not to be as part of the purchase price of the land in question.

We are of opinion that the court erred, and the decree will be reversed and the cause remanded, with directions to dismiss the bill.

*Decree reversed.*