(No. 12442.—Decree affirmed.)

JOHN J. ROCHE *et al.* Appellants, *vs.* THOMAS A. ROCHE, Appellee.

*Opinion filed December 18, 1918—Rehearing denied Feb. 7, 1919.*

1. DEEDS—*what is sufficient proof of the execution of a deed.* The production by the grantee of a deed duly acknowledged before a notary is sufficient proof of the execution of the deed by the grantor.

2. SAME—*fact that deed from father to son is in the son's possession raises a strong presumption of delivery.* The fact that a deed from father to son is in the son's possession and is recorded by him in the father's lifetime without objection raises a strong presumption of delivery, which can be overcome only by clear and convincing evidence.

3. SAME—*right of grantor to set aside a deed to son for non-performance of some condition is personal.* Where a father has voluntarily executed a deed to his son with the understanding that the grantee shall do certain things, the right to set aside the deed because such things were not done is personal to the grantor and is not transferred to his heirs or devisees.

4. SAME—*when a deed is not the result of undue influence.* A deed from father to son cannot be set aside as having been obtained by undue influence where the evidence tends to show that the father was the moving party to the transaction and that when he went to a near by city and had the deed made the son was not with him.

5. SAME—*what does not justify setting aside deed on ground of intoxication.* Mere proof that about the period when a deed was executed the grantor was sometimes drinking to excess does not justify holding the deed invalid on the ground of intoxication, where there is no evidence that the grantor was intoxicated or under the influence of liquor when the deed was made.

6. SAME—*when fiduciary relation does not exist.* A fiduciary relation between a father and a son to whom he executed a deed cannot be said to exist where the evidence on that subject is that the son occupied the same position with reference to the father and his business affairs before the deed was executed that the other sons occupied, except that he was older than they and of more assistance to the father.

7. TRUSTS—*what does not show a resulting trust.* A resulting trust arises, if at all, at the time the deed is made and the title vests, and hence an alleged promise by a grantee, many years after

the deed was made, that he would divide the land equally between himself and his brothers, would not, if made as alleged, give rise to a resulting trust.

8. Same—*a constructive trust is based upon fraud.* In order to establish a constructive trust against the grantee in a deed in favor of third parties there must be fraud, actual or constructive, in the conveyance of the title to the grantee, and to establish such fraud the evidence must be clear and convincing.

9. Same—*what necessary to render influence undue.* To render influence by a grantee over a grantor undue it must be such as to overcome the grantor's free agency and must be exercised and be operating at the time the conveyance was made.

10. Same—*when an alleged express trust is void.* An alleged verbal promise by a grantee, many years after the deed was made, to divide the land equally between himself and his brothers, tends to show an express trust, and not being in writing the trust can not be enforced as against a plea of the Statute of Frauds.

11. Evidence—*when the defendant may testify though the complainants sue as heirs.* In a partition proceeding where the complainants sue as heirs and seek to include in the proceeding a tract of land to which the defendant holds a deed, the defendant, under the third exception to section 2 of the Evidence act, may testify to conversations and transactions brought out in the testimony of the complainants.

Appeal from the Circuit Court of Coles county; the Hon. Walter Brewer, Judge, presiding.

Bryan H. Tivnen, and Craig & Kinzel, for appellants.

George M. Thompson, and Edward C. Craig, for appellee.

Mr. Justice Carter delivered the opinion of the court:

This was a bill filed by appellants in the circuit court of Coles county for the partition of 160 acres of land in said county and 80 acres in Piatt county. The appellee answered, admitting that 160 acres in Coles county should be partitioned as prayed but denied that the 80 acres in Piatt county should be so partitioned. After the pleadings were

286 — 22

settled and hearing had in open court before the chancellor a decree was entered providing for a partition of the Coles county land but ordering that the bill as to the partition of the 80 acres in Piatt county be dismissed for want of equity at appellants' costs. From that decree this appeal was taken.

It appears from the record that in 1887 John Roche signed and acknowledged a deed for the 80 acres of land here in question to his son Thomas A. Roche. From the pleadings and briefs of appellants it is contended that this deed was obtained by said son from his father through undue influence; that the conveyance was made to defraud creditors; that if the deed was ever delivered a resulting trust arose thereunder in favor of appellants. It also seems to be argued that there was a constructive trust, and also that under an express agreement of trust appellants had an interest in said 80 acres. Appellee in his answer and in the evidence produced in the record denies all of these claims.

The record shows that John Roche, the father of appellants and appellee, died at about the age of 88 years on May 21, 1916, in Coles county. Before purchasing the land in Coles county he had lived in Piatt county and had originally owned there 96 acres of land, which is frequently called in this record the 100-acre tract, and later purchased, about 1880, the south half of the southeast quarter of section 12, township 16, north, range 5, east, in Piatt county, subject to a mortgage of $1400. This was the 80 acres in litigation. It was south of the 96-acre tract and adjacent thereto. Roche's wife died in 1881. There were born to them twelve children, nine of whom were surviving at her death and were still surviving at their father's death and at the time of the trial in the circuit court. These children were as follows: Mary Curry, 61 years old; Thomas A. Roche, 59 years old; Richard Roche, 57 years old; Margaret Parker, 53 years old; Matthew Roche, 51 years old; Alice Redington, 49 years old; John Joseph Roche, 47 years

old; Michael Roche, 45 years old; Nora Roche, 41 years old. There is evidence showing that before the death of the wife she stated to her husband that she would like the son Tom to have the 80 acres in question. In 1885 Richard, then 24 years old, had left home. Thomas, then 26 years of age, was living with his father on the Piatt county land and assisting in farming it. The two appellants, John J. and Michael, were then, respectively, 12 and 14 years of age. The evidence tends to show that at about this time Roche said to a neighbor, Loveless, that he believed his son Thomas was thinking of leaving home; that he didn't know how to get along without him in carrying on the farm; that if Thomas would stay at home on the 80-acre farm he would give it to him. One of the sisters, Mrs. Parker, testified that she heard her father in 1885 tell her brother Thomas that if he would stay and help him he would give him this 80 acres. Mrs. Parker was then unmarried and living at home. Her father also told her some ten years later that he had given Tom writings for the 80 acres. Another sister, Mrs. Redington, testified that she heard her father tell Thomas that if he would stay with him on the home place or on the 80 until it was paid out he might have the 80; that this conversation occurred in 1886, two years before Thomas was married. Loveless' testimony is to the effect that on April 20, 1887, a short time after he had the talk with Roche about giving the deed to the 80 to Tom, Roche went to Decatur and had the deed here in question drawn, executed and acknowledged; that a day or two thereafter he met Roche at a road crossing, and while they were talking together Tom came up in a buggy, and that during the conversation Roche said to his son Tom that he had now given him a deed for the 80; that he would like to farm 30 acres of it with the assistance of his younger sons and help pay off a $1400 mortgage then on the 80 and which in said deed he had agreed to pay off. Counsel for appellants contend that Loveless' testimony, if it is to be

fully relied on,—which they question,—should be construed to mean that Tom went with his father to Decatur when the deed was drawn. We do not think this is a necessary inference from his testimony. True, he said that the father in the first conversation stated that he believed, in order to have Tom stay with him, he would take Tom and go to Decatur and have the deed drawn conveying to him the 80 acres, but the evidence of Loveless, fairly construed, is not to the effect, as argued by counsel for appellants, that when they met at the road crossing the father and his son Tom were just returning from Decatur together after the execution of the deed. His evidence shows that he met the father at this road crossing on the day in question and that Tom was not with him but joined them thereafter, driving up in a buggy. It appears from the evidence that the 80 acres in question were divided by a railroad, leaving about 30 acres on one side of the right of way and 50 acres on the other. Loveless testified that the father told Tom at that time that he did not want him to tell the other children about the deed and not to put it on record; that the deed was all right and conveyed the property to him; that he could record it at any time, even after the father died, and it would be good; that he wanted him to have the 80 but did not want to have trouble over the deed with the other children. The evidence tends to show further that the father farmed the 30 acres,—the part of the 80 cut off by the railroad,—along with the rest of his land in Piatt county from 1887 until 1904, when, for the purpose of getting more land for the same amount of investment, he sold the 96-acre tract and re-invested the proceeds in 160 acres north of Mattoon, in Coles county, and removed with the appellants, and possibly some of the younger children, to the 160 acres, where he resided with the appellants until his death. Apparently each of the appellants lived on one of the 80's of this 160 after being married, and the father spent part of his time with one and part with the other.

The evidence shows that the day, month and year on the deed were blank. It was evidently drawn on a blank printed form, but the line for the date just above the signature of John Roche was not filled in and reads: "Dated this .... day of ......... A. D. 188..." The evidence tends to show that the deed was in the handwriting of one Burroughs, who was then in the banking business in Decatur, and acknowledged by one of his employees, John B. Prestley, a notary public. Burroughs had been dead for some years at the time of this hearing. Prestley testified that the acknowledgment was taken by him, but that he had no independent recollection, outside of his handwriting and the seal, with reference to this transaction, although he was sure he took the acknowledgment. The deed was acknowledged April 30, 1887.

In 1913 proceedings were started by one of John Roche's daughters, in the county court of Piatt county, asking to have a conservator appointed to look after the father's property. It would appear from the record that there had been some discussion among the children about this before the petition was filed. At any rate, it seems that appellee heard something about the discussion some months before the petition was filed and late in 1912 filed the deed in question for record in the recorder's office in Piatt county. The evidence tends to show that he advised with someone about filing this deed before he filed it, but it is not clear, as claimed by counsel for appellants, that he was advised by an attorney to file it, and whether the person he consulted was an attorney or not is uncertain from the testimony. Appellants testified that while the conservatorship proceedings were pending they came up from Coles county to Piatt county to talk with their brother Tom about these proceedings; that they were telephoned to either by appellee or one of the sisters to come, and while there they heard for the first time from appellee that he had a deed for the 80 and had filed it, and that he told them that if

they would stand by him and resist the conservatorship proceedings he would stand by them as to the division of the property and put in his 80 along with the two 80's in Coles county and divide with them equally, dollar for dollar. Appellee denied that he requested them to come from Coles county to discuss the conservatorship proceedings, or that he requested them to stand by him and said he would stand by them and divide the 80 along with the Coles county land. He testified that the conversation, so far as it took place, was started by them, and they requested him to stand by them in the conservatorship proceedings rather than he making the request of them. There is testimony by a son of appellee which tends to support, in some degree, his father's version as to these conversations. While these conservatorship proceedings were pending the father came to Piatt county to stay for a time with appellee. Mrs. Ryan, a daughter of appellee, testified that while he was there she heard her father tell her grandfather, in response to a question by the latter, that he had recorded the deed to the 80, and that the grandfather said he had been worrying about it a little and was very glad it was recorded. The conservatorship proceedings were partially heard, and were dismissed on the ground that John Roche was a resident of Coles county and not of Piatt county; that such proceedings must be brought in the county of his residence.

The evidence shows that on December 31, 1904, John Roche executed and published his last will and testament, leaving all of his personal property to appellants and dividing all the real estate of which he died seized, without describing it, share and share alike, between appellants and appellee, with the provision that various sums of money as bequests should be paid by the three boys to whom the real estate was devised to the other children, and providing further that the payment of said bequests should be a lien on the real estate until they were paid. The will was probated on May 8, 1916, in the county court of Coles county. It

appears from the allegations in the bill that there was a
contest filed in the circuit court of that county with refer-
ence to said will which was decided adversely to contestants,
the will being sustained.  The will named the testator's sons
John and Thomas as executors, and they qualified as such
executors and after the will contest was disposed of closed
the estate and were discharged.

As happens frequently in disputes of this character, the
evidence in this case is very conflicting as to whether the
father or appellee had possession and claimed ownership of
the 80 acres here in question between the time the deed
was executed and the time it was recorded.  There is evi-
dence tending to show that the father was generally reputed
to be the owner of this 80 during all the years before the
deed was recorded.  There is also evidence from quite a
number of witnesses who lived in the vicinity which tends
to show that for years before the deed was recorded it was
generally understood that appellee owned the 80.  Both ap-
pellants testified that they had never heard about the deed
or knew anything about it until they were told by appellee
during their conversation with him with reference to the
conservatorship proceedings, which appear to have been in
the early part of 1913, and at least one of the other sons
of John Roche testified to the same effect.  In addition to
the testimony of Mrs. Parker and Mrs. Redington, daugh-
ters of John, another sister, Mrs. Curry, testified that she
had heard of the deed to her brother Tom for the 80 shortly
after he married, in 1888.  There is also testimony of cer-
tain people when insuring the property on said 80 acres,
some time after the deed in question was executed, that they
were told by the father that he owned said 80, and that
appellee admitted, during the preparation of these insurance
papers, that the 80 acres were owned by his father.  Ap-
pellee denies that he ever so admitted, and claims that he
told one of these men positively that the 80 belonged to
him; that he had a deed for the 80 but it was not recorded.

The evidence tends to show that one of these policies was taken out in the joint names of the father and Thomas. The evidence is not clear as to who paid the taxes on this 80 from the time the deed was executed down to 1905, but from 1905 down to the date of this hearing the record clearly shows that appellee paid the general taxes and the two drainage assessments that were levied on the 80 during those years. It also appears that a drainage district was formed, including this land, after the execution of the deed; that a surveying party, while the father lived in Piatt county, came to the land upon which the father then resided and were told by him that they could not go across the land to survey it. One of the surveying party testified that during this conversation, in the presence of both appellants, the father stated that the 80 in question belonged to his son Tom. Both appellants testified denying that any such statement was made in their presence. It appears further that appellee voted at several elections in this drainage district after the deed was executed and after his father had moved to Coles county and before the deed was recorded, and it is apparent that he was permitted so to vote because it was understood by the drainage officials that he owned the 80. The evidence also tends to show, in our judgment, without contradiction, that from the time the deed was executed until this hearing appellee had possession of the 80, excepting the piece cut off by the railroad, until 1904, and that from the time his father moved to Coles county he had possession of the entire 80 down to the time of this hearing. It is clear, also, that he never paid any rent to his father on any part of it during all these years, and there is no testimony tending to show that his father ever made any demand on him that he should pay rent during those years. While there is some testimony to the effect that the father had been heard to say that Tom ought to pay him rent, it is not shown that these statements were ever made in appellee's presence. Appellants

testified that appellee told them he filed the deed as to the
80 acres because he thought some of the heirs would try
to collect rent from him for his use of the place since his
father turned it over to him.  Appellee denies ever making
such statement.  There is evidence also in the record that
the father, after executing this deed, mortgaged this 80
more than once, apparently for the purpose of taking care
of the mortgage of $1400 which was on the place at the
time he deeded it to his son.  None of these mortgages ever
exceeded $1400 in amount, and it is contended by counsel
for appellee,—and there is some evidence in the record to
support the contention,—that appellee knew of these mort-
gages being executed, and, because he wanted to co-operate
with his father in continuing the loan, did not object to
the father making the mortgages after the deed had been
executed.  The deed was recorded December 20, 1912, and
there is no evidence which tends to show that the father
ever found fault with the fact that it was recorded, and
there is evidence which shows clearly that he was told by
appellee that he had recorded the deed and he assented and
approved of it.

Counsel for appellants argue earnestly that the deed in
question was never delivered.  There is merit in the argu-
ment of counsel for appellee that under the allegations of
the bill this question was not raised or presented and there-
fore cannot be raised here in the briefs; that the allegations
of the bill practically concede that the deed was executed
and delivered.  Of course, the arguments of counsel for
appellants as to a trust, whether express, constructive or
resultant, are inconsistent with any claim that the deed was
not delivered, as there can be no basis for an implied or
express trust in this proceeding unless the deed was actually
delivered by the father to the son.  Under the statute the
production of this deed, duly acknowledged before a no-
tary, was sufficient proof of the execution of the deed by
the father.  (Hurd's Stat. 1917, sec. 35, p. 665; *Schroeder*

v. *Smith,* 249 Ill. 574.) There can be no argument made on this record that this deed was not actually signed and acknowledged by John Roche. The testimony of a son and daughter of appellee, both of whom had taught school and are apparently young people of more than average intelligence, was clearly to the effect that this deed had been in the possession of their father for many years and had been kept by him in a trunk, and that they had seen it there frequently. The argument of counsel for appellants attempting to belittle the force of the testimony of the daughter on this question because she stated that she kept some of her dolls and playthings in the same trunk, in our judgment is without merit. There is nothing in the testimony of either of these young people that in any way throws discredit on their testimony as to their father having possession of this deed. In the case of a voluntary settlement by a parent on a child by a deed the law makes stronger presumptions in favor of the delivery of the deed than in ordinary cases of bargain and sale. In such a case the presumption of law is in favor of the delivery, and the burden of proof is upon those claiming a lack of delivery to show clearly that there was no delivery. As the deed was in the possession of appellee and was produced by him there is a strong implication that it had been delivered, and only clear and convincing evidence could overcome that presumption. *Inman v. Swearingen,* 198 Ill. 437; *Schroeder v. Smith, supra;* see, also, *Valter. v. Blavka,* 195 Ill. 610; *Rodemeier v. Brown,* 169 id. 347; *Johnson v. Fulk,* 282 id. 328.

We find some argument in the briefs of counsel for appellants that the deed from the father to appellee should be set aside because the testimony tends to show that appellee agreed to stay with his father until the mortgage of $1400 on the place was paid off, and he did not live with the father at any time after the deed was executed but lived on the 80 acres and did not go with his father to Coles county. In view of the facts in this record we think there

is very little force in this argument. Moreover, where a parent is a moving factor and enters into a transaction voluntarily, deliberately and advisedly, knowing all about it, with a condition that the child shall do certain things in order to make the deed valid, and the child does not carry out his promise, the deed cannot be set aside, after the parent's death, on the ground of having been obtained by fraud. The right to have the deed set aside on this ground is purely personal to the grantor, and that right is not transferred to his heirs or devisees. (*Berry* v. *Heiser,* 271 Ill. 264.) It is clear from this record that the father never made any attempt to have this deed set aside, although it was recorded several years before his death.

It is strenuously argued in this connection by counsel for appellants that the deed was not voluntary and deliberate but was obtained by improper and undue influence exercised by appellee upon the father; that the evidence shows that the father was drinking intoxicating liquors to excess at that time, and that as the son then occupied a fiduciary relation with the father the burden of proof was upon him to show that the conveyance was made in entire good faith. Undue influence, to be of the kind recognized by the law, must operate at the time of the transaction sought to be impeached. The evidence in this case tends to show that appellee was not present when this deed was prepared and executed in Decatur, and hence he could not have exerted undue influence at the time it was executed. There is no positive evidence in this record to the effect that appellee ever asked or urged his father to deed the 80 to him. Neither do we think the evidence justifies the argument of counsel for appellants that appellee threatened to leave his father unless the 80 was so deeded. The most that can be said in support of this argument is that the father knew that the son was talking about leaving him shortly and he did not want him to go. Doubtless appellee was talking about leaving because he was to be married

in a short time and felt that he had to begin to care for himself. So far as there is any positive evidence in the record on this point, it tends to show that the father was the moving factor in proposing the conveyance and carrying it out. While there is proof in the record which tends to show that about the period of time this deed was executed the father was sometimes drinking to excess, there is absolutely no proof that he was intoxicated or under the influence of liquor at the time the deed was executed. In order to defeat a deed on the ground of intoxication it must appear that the party was in such condition as to be incapable of understanding the transaction. *Shackelton* v. *Sebree,* 86 Ill. 616.

The most serious contention made by counsel for appellants, however, is that a fiduciary relationship existed between the father and appellee at the time the deed was executed and therefore the burden is upon appellee to show that the transaction was made in good faith, and that the proof tends also strongly to show a constructive trust in behalf of appellants. They argue that the fact that the father in 1904, shortly after he left Piatt county and moved to Coles county, executed a will in which he devised all his real estate, wherever situated, to appellants and appellee, three of his sons, in equal portions, subject to the payment of certain bequests to his other children, indicates that he intended to divide all his real estate, both the 160 in Coles county and the 80 in Piatt county, among the three sons, and that it is manifest from the actions of Thomas in that regard, and from what he stated to appellants at the time of the conservatorship proceedings, that Thomas understood. it in that way and agreed that the property should be divided equally among the three sons. We do not find the slightest evidence in the record that indicates that appellee exercised any undue or improper influence upon his father to obtain the execution of this deed or that fiduciary rela· tions existed between the father and appellee at the time.

There is, moreover, positive testimony in the record given by Richard Roche, a witness for appellants, that appellee occupied the same relationship to his father with reference to his father's business affairs while he was on the farm previous to the execution of this deed that all the other sons did,—no different in any particular. This court, in discussing whether a fiduciary relationship existed between a parent and a son-in-law, in *Bishop* v. *Hilliard, 227* Ill. 382, said (p. 386) : "We are at a loss to perceive upon what theory a fiduciary relation between the parties can be said to exist. Nothing more than the ordinary and usual family relations seems to have existed between the parties during the time the mother resided with the daughter. A fiduciary relation which brings the parties within the rule contended for by counsel for the appellant is one growing out of the relation of administrator and heir, guardian and ward, attorney and client, principal and agent,—in other words, where the business of one is entrusted to another in such a way as to render the principal liable to be imposed upon by the agent. * * * The acts of the son-in-law were no more than might be expected of one bearing that relation to the mother of his wife, who was a member of his family." That statement and reasoning apply with much force to the facts in this case. We do not see that the acts of the son as shown by this record, either by direct or circumstantial evidence, were any different than might be expected of a son toward his father at the time the deed was executed. A fiduciary relation might exist and a transaction between the parties still be valid if it is made to appear that it was entered into with full knowledge of its nature and effect and was the result of deliberate, voluntary and intelligent desire on the part of the parties acting and was not secured by the exercise of the influence engendered as a result of the relation existing between the parties. (*Kellogg* v. *Peddicord,* 181 Ill. 22; *Bishop* v. *Hilliard, supra.*) There is no presumption that the conveyance from a parent to a child was

brought about by fraud or undue influence. There must be proof of such fraud or undue influence in fact before it can be held that such conveyance can be set aside on that ground. (*Hudson* v. *Hudson,* 237 Ill. 9; *Sears* v. *Vaughan,* 230 id. 572, and cases there cited.) Influence acquired through affection is not wrongful and a deed will not be held void because of that. *Francis* v. *Wilkinson,* 147 Ill. 370; *Sargent* v. *Roberts,* 265 id. 210.

Counsel in their bill and in their briefs argue that this deed could be held to establish a resulting or constructive trust. Counsel apparently do not distinguish clearly between resulting and constructive trusts. All trusts, whether of real or personal property, are divided into two great classes: those created by some definite act of a party having dominion over the property, called express trusts, and those created by operation of law. (1 Pomeroy's Eq. Jur.—3d ed.—sec. 152.) Those trusts which are created by operation of law arise from the deeds, wills, contracts, acts or conduct of the parties, "without any express intention and often without any intention, but always without any words of declaration or creation. They are of two species, 'resulting' and 'constructive,' which latter are sometimes called *ex maleficio;* and both these species are properly described by the generic term 'implied trusts.' Resulting trusts arise where the legal estate is disposed of or acquired, not fraudulently or in the violation of any fiduciary duty, but the intent, in theory of equity, appears or is inferred or assumed from the terms of the disposition or from the accompanying facts and circumstances, that the beneficial interest is not to go with the legal title. In such case a trust 'results' in favor of the person for whom the equitable interest is thus assumed to have been intended and whom equity deems to be the real owner. Constructive trusts are raised by equity for the purpose of working out right and justice where there was no intention of the party to create such a relation and often directly contrary to the intention of the

one holding the legal title.  All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations."  1 Pomeroy's Eq. Jur. (3d ed.) sec. 155; see, also, as to the distinction between resulting and constructive trusts, 1 Perry on Trusts, (6th ed.) sec. 127, note (*b*), and cases there cited; also 3 Story's Eq. Jur. (14th ed.) sec. 1590.

Counsel for appellants rely very strongly upon the testimony of appellants to the effect that appellee promised them, at the time of the conservatorship proceedings in 1913, that the real estate, including the 80 here in question and the real estate in Coles county, should be divided equally between appellants and appellee.  Under the decisions of this court this testimony of appellants could not in any way tend to prove a resulting trust.  Under the repeated decisions of this court a resulting trust arises, if at all, the instant the deed is taken and the legal title vests.  No payment made will create a resulting trust unless at the moment the title passes the trust results from the transaction itself.  No oral agreement or payment, before or after the transaction, will create such a trust.  The trust results from the action itself at the moment the title passes.  *Strong* v. *Messinger,* 148 Ill. 431; *Lord* v. *Reed,* 254 id. 350; *Baughman* v. *Baughman,* 283 id. 55, and cases there cited.

Neither do we think the proof offered in this record can sustain the conclusion that under this conveyance an equitable title can be held to be in appellants on the ground of a constructive trust.  It is clear from the definition quoted above from Pomeroy, that in order to hold a conveyance to be a constructive trust either actual or constructive fraud must enter into the transaction by which the title is conveyed from the grantor to the grantee, and, generally speaking, there must also be fiduciary relations existing between the parties to the conveyance.  As we have before stated, we do not see how it can be held on this record that a fidu-

ciary relation existed in this case, as that term is generally understood.

Neither do we see how it can be reasonably argued that there was any fraud or wrong action on appellee's part in obtaining the deed. Undue influence is a species of constructive fraud which the courts will not undertake to define by definite words or rules, but such influence, to render a conveyance void, must be of such a nature as to deprive the grantor of his free agency. It is not sufficient to avoid a will or deed that its execution was procured by honest argument, untainted by fraud. Such influence must be exercised and operate at the time of the transaction sought to be impeached. Then, too, something more than mere suspicion is required to prove the allegation of fraud. The evidence must be clear and cogent and must leave the mind well satisfied that the allegation is true. (*Valbert* v. *Valbert,* 282 Ill. 415, and cases there cited.) There is no evidence in this record by any person who was present at the time the deed was executed, and there is not the slightest evidence, positive or circumstantial, that tends to prove that appellee or anyone else was exercising any undue influence on the mind of the grantor at that time. A conclusion that the father intended this 80 to be divided as part of his estate in accordance with the will drawn and executed by him some sixteen or seventeen years thereafter could only be based upon the merest suspicion, without any satisfactory evidence of any character to sustain it. To uphold this argument on this point counsel for appellants rely strongly upon the case of *Stahl* v. *Stahl,* 214 Ill. 131. A bare reading of that case and a comparison of the facts there with the facts connected with this conveyance will show why the reasoning in that case in no way applies here. There the legal title to the land was conveyed to a son by the mother on her deathbed at night, to be held by him in trust for all the children, the conveyance being without consideration and the result of the confidence reposed in the

grantee by the mother and the children. Here there is no evidence of any character that tends to show that this deed was executed with that purpose or understanding. We do not think that anything we have said here in discussing the question of resulting or constructive trusts is in any way out of harmony with the reasoning and conclusion reached in the *Stahl case.*

Counsel for appellants suggest but do not argue very strenuously that the testimony of appellants as to the promises of appellee at the time of the conservatorship proceedings concerning the division of this 80 along with the other two 80's equally between appellants and appellee, would justify the court in setting aside this deed on the ground of an express trust. Of course, such an argument is directly opposed to the argument that this title should be held in appellants on the ground of an implied trust. A trust based on the evidence of appellants as to promises by appellee at the time of the conservatorship proceedings, if held to be express and not constructive and being in no part manifested in writing, must be held to be void under the Statute of Frauds, which is set up and pleaded in the answer in this case. Indeed, it seems to us that if this testimony of appellants as to the promises of appellee at the time of the conservatorship proceedings is of any force it must tend to support an express trust, and therefore, under the authorities, is void under the Statute of Frauds. *Rogers v. Simmons,* 55 Ill. 76; *Williams v. Williams,* 180 id. 361.

Much of the evidence relied on by counsel for appellants to show that the father never intended to deed this 80 to appellee cannot be properly considered on the question of the validity of the deed, as such evidence did not relate to the time the deed was executed and was not a part of the *res gestæ.* (*Lord v. Reed, supra; Clark v. Harper,* 215 Ill. 24; *Shields v. Bush,* 189 id. 534; *Dodge v. Thomas,* 266 id. 76.) Neither is the alleged admission of appellee that he was not the owner of the land of any great weight in

deciding this question. (*Wells* v. *Messenger,* 249 Ill. 72; *Corder* v. *Corder,* 124 id. 229.) The fact that the deed was not recorded until long after it was executed, even though the failure to record it for years was at the request of the grantor, in no way bears on the question as to whether the deed was delivered. (*Doan* v. *Hostetler,* 215 Ill. 635; *Inman* v. *Swearingen, supra; Potter* v. *Barringer,* 236 Ill. 225.) The fact that the father retained possession of part of this land after the deed was executed, and the fact, if it be a fact, that he paid the taxes during the first few years on the entire 80 or renewed or made other mortgages thereon, is not necessarily controlling if this deed from the father to appellee was delivered before that. It has been held that the fact that after the execution and delivery of a deed the grantor retained possession of the land, executed mortgages, obtained insurance or collected rents on a part or all of the premises does not invalidate the deed. (*Doan* v. *Hostetler, supra; Ward* v. *Conklin,* 232 Ill. 553; *Lines* v. *Willey,* 253 id. 440; *Potter* v. *Barringer, supra.*) There can be no question as to the execution and delivery of the deed of this 80, therefore the proof as to the father working part of the land and making mortgages on the same, or having insurance policies executed as if he were the owner, can not invalidate the deed after it was executed and delivered.

Counsel for appellants argue further that the testimony of appellee was improperly received under section 2 of the Evidence act, (Hurd's Stat. 1917, p. 1483,) as appellants were suing as heirs. Appellee did not testify generally as to the entire case but only as to conversations and transactions brought out in the testimony of appellants, and therefore, under the third exception in section 2, his testimony was admissible as to such conversations and transactions that had been brought out by the opposing parties. *Butz* v. *Schwartz,* 135 Ill. 180; *Blanchard* v. *Blanchard,* 191 id. 450.

In this connection it is proper to refer to an argument of counsel for appellants in another part of their brief, that

the evidence tends to show that appellee was present at Decatur when the deed for the 80 was executed and that he does not deny being present, and therefore it is reasonable to assume that he was present. There is no testimony tending to show, in our judgment, that he was present at the execution of the deed, and therefore his testimony on that point, under section 2 of the Evidence act, would have been incompetent.

The conclusion we have reached on this question is strengthened by the fact that the findings of the chancellor, who heard and saw the witnesses who testified in open court, are in accord with our conclusion. The decree of the chancellor, under such circumstances, will not be disturbed unless it appears that his findings of fact are clearly and palpably wrong. (*Dowie* v. *Driscoll,* 203 Ill. 480; *Preston* v. *Lloyd,* 269 id. 152.) These findings of fact are not palpably wrong. On the contrary, we think the weight of the evidence tends to support the chancellor's conclusions.

The decree of the circuit court will be affirmed.

*Decree affirmed.*

----

(No. 12153.—Appellate Court reversed; municipal court affirmed.)
THE CARSTENS PACKING COMPANY, Plaintiff in Error, *vs.*
STERNE & SON COMPANY, Defendant in Error.

*Opinion filed December 18, 1918—Rehearing denied Feb. 7, 1919.*

1. CONTRACTS—*interpretation of written contract is a question of law and not of fact.* Where a contract consists wholly of letters and telegrams its construction is a matter of law for the courts and is not a question of fact, and in such case a finding by the Appellate Court as to what the contract was is a conclusion of law.